WATERMAN, Justice.
This products liability action against pharmaceutical companies presents several issues involving the interplay between state tort law and federal prescription drug regulation. This case is one of many litigated in state and federal courts nationwide alleging severe side effects from prolonged use of metoclopramide, sold under the brand name Reglan and as a competing generic formulation. The plaintiff in this case used only the generic product. After developing a neurological disorder, she sued the manufacturer of the generic drug as well as the manufacturers of the branded formulation.
The district court dismissed all of plaintiffs claims in several summary judgment rulings. The district court, relying on PLIVA, Inc. v. Mensing, 564 U.S. -, -, 131 S.Ct. 2567, 2580-81, 180 L.Ed.2d 580, 595 (2011), ruled plaintiffs claims against the generic manufacturer were preempted by federal law that requires conformity with the brand manufacturers’ warning labels approved by the Food and Drug Administration (FDA). The district court granted summary judgment for the brand manufacturers based on Mulcahy v. Eli Lilly & Co., which requires proof the defendant manufactured or supplied the product that caused plaintiffs injury. 386 N.W.2d 67, 76 (Iowa 1986). The court of appeals affirmed. We granted plaintiffs application for further review.
For the reasons explained below, we hold plaintiffs state common law tort claims against the generic manufacturer based on inadequate warnings are not preempted to the extent that the generic manufacturer failed to implement a stronger warning approved by the FDA in 2004. We decline, however, to alter long-standing Iowa products liability law to allow recovery against a manufacturer for injuries caused by use of its competitor’s product. We thereby join the overwhelming majority of courts, including every federal circuit court of appeals, in holding Reglan brand manufacturers are not liable to plaintiffs who consumed only the competing generic formulation. Accordingly, we vacate the decision of the court of appeals, affirm the district court’s summary judgment for the brand manufacturers, reverse in part the summary judgment for the generic manufacturer, and remand for further proceedings against that defendant alone.
I. Background Facts and Proceedings.
We begin with a discussion of federal drug labeling regulation to provide the necessary context for the fighting issues. In 1984, Congress passed the Hatch-Wax-man Amendments to the Food, Drug, and Cosmetics Act (FDCA) in order to expand access to affordable generic drugs by reducing barriers to generic market entry. Drug Price Competition and Patent Term Restoration Act of 1984, Pub.L. No. 98-417, 98 Stat. 1585 (codified in relevant part at 21 U.S.C. § 355 (1988)); see also Mensing, 564 U.S. at -, 131 S.Ct. at 2574, 180 L.Ed.2d at 588. Prior federal law compelled virtually all companies to file a new drug application — requiring costly *357 clinical trials — to receive FDA approval to market a drug. Mensing, 564 U.S. at -, 131 S.Ct. at 2574, 180 L.Ed.2d at 588. Hatch-Waxman eliminated this requirement for a generic drug applicant, instead requiring the applicant to demonstrate its product’s chemical and biological equivalence to a previously approved drug — i.e., a brand manufacturer’s drug. See id. at -, 131 S.Ct. at 2574, 180 L.Ed.2d at 588; see also 21 U.S.C. § 355(j)(2)(A) (2006).
When a brand manufacturer first files a new drug application, the FDA must approve the accuracy and adequacy of a drug’s label. See 21 U.S.C. § 355(a), (b)(1), (d); Wyeth v. Levine, 555 U.S. 555, 566-67, 129 S.Ct. 1187, 1195, 173 L.Ed.2d 51, 61 (2009). After the initial approval of the new drug application, a brand manufacturer may update its label by filing an application with the FDA to “add or strengthen a contraindication, warning, precaution, or adverse reaction” or to “add or strengthen an instruction about dosage and administration that is intended to increase the safe use of the drug product,” but it need not wait for FDA approval. 21 C.F.R. § 314.70(c)(6)(iii)(A), (C) (2006); see also Levine, 555 U.S. at 567-68, 129 S.Ct. at 1196, 173 L.Ed.2d at 62. The equivalence of brand-name and generic drugs is the foundation of the generic drug approval process, and accordingly, federal regulations “require that the warning labels of a brand-name drug and its generic copy must always be the same — thus, generic drug manufacturers have an ongoing federal duty of ‘sameness.’” Mensing, 564 U.S. at -, 131 S.Ct. at 2574-75, 180 L.Ed.2d at 589; see also, e.g., 21 U.S.C. § 355(j)(2)(A)(v), (4)(G); 21 C.F.R. §§ 314.94(a)(8), .127(a)(7); Abbreviated New Drug Application Regulations, 57 Fed.Reg. 17950-01, 17961 (Apr. 28, 1992) (“[T]he [generic drug’s] labeling must be the same as the listed drug product’s labeling because the listed drug product is the basis for [generic drug] approval.”). The requirement that generic labeling mirrors that of the brand drug ensures generic manufacturers do not mislead consumers by “inaccurately implying] a therapeutic difference between the brand and generic drugs.” Mensing, 564 U.S. at -, 131 S.Ct. at 2576, 180 L.Ed.2d at 590. Manufacturers — both brand and generic — are required to propose stronger warning labels to the FDA if they believe such warnings are needed. Id. at -, 131 S.Ct. at 2576, 180 L.Ed.2d at 591.
The United States Supreme Court decisions of Levine and Mensing set parameters for when state-law failure-to-warn claims are preempted by federal prescription drug labeling regulations. First, Levine held that federal drug regulations do not preempt state-law failure-to-warn claims against brand manufacturers because federal law allows brand manufacturers to unilaterally strengthen their warnings. 555 U.S. at 573, 129 S.Ct. at 1199, 173 L.Ed.2d at 65 (concluding requiring brand drug manufacturers to comply with a state-law duty to warn would not obstruct the purposes and objectives of federal drug labeling regulation). “The Court did not find it significant that the FDA has authority to reject unilateral labeling changes ... finding it ‘difficult to accept’ that the FDA would not have permitted a change to a stronger warning.” Fulgenzi v. PLIVA, Inc., 711 F.3d 578, 582 (6th Cir.2013) (quoting Levine, 555 U.S. at 570, 129 S.Ct. at 1197, 173 L.Ed.2d at 63). After Levine, some courts reasoned that generic drug manufacturers would then also be subject to state-law failure-to-warn claims. See, e.g., Demahy v. Actavis, Inc., 593 F.3d 428, 430 (5th Cir.2010) ([“Levine ] shadows our conclusion that the federal regulatory regime governing generics is also without preemptive effect.”), rev’d *358 sub nom. Mensing, 564 U.S. at -, 181 S.Ct. at 2573, 180 L.Ed.2d at 587; Mensing v. Wyeth, Inc., 588 F.3d 603, 607 (8th Cir.2009) (“After [Levine ], we must view with a questioning mind the generic defendants’ argument that Congress silently intended to grant the manufacturers of most prescription drugs blanket immunity from state tort liability when they market inadequately labeled products.”), rev’d sub nom. Mensing, 564 U.S. at -, 131 S.Ct. at 2573, 180 L.Ed.2d at 587.
But, the Supreme Court held otherwise in Mensing, a case involving generic manufacturers of metoclopramide. 564 U.S. at -, 131 S.Ct. at 2572, 180 L.Ed.2d at 586. The five-justice majority noted the FDA interprets its regulations “to allow changes to generic drug labels only when a generic drug manufacturer changes its label to match an updated brand-name label or to follow the FDA’s instructions.” Id. at -, 131 S.Ct. at 2575, 180 L.Ed.2d at 590 (emphasis added). Otherwise, a generic manufacturer is obligated to copy the brand manufacturer’s approved label. See id. at -, 131 S.Ct. at 2575, 180 L.Ed.2d at 590. Accordingly, the Court agreed with the FDA’s interpretation of its regulations that “changes unilaterally made to strengthen a generic drug’s warning label would violate the statutes and regulations requiring a generic drug’s label to match its brand-name counterpart’s.” Id. at -, -, 131 S.Ct. at 2575, 2580, 180 L.Ed.2d at 590, 595 (emphasis added) (highlighting that “[bjefore the Manufacturers could satisfy state law, the FDA — a federal agency — had to undertake special effort permitting them to do so”). Due to this conflict, the Court held federal law categorically preempts state-law failure-to-warn claims against generic manufacturers. Id. at -, 131 S.Ct. at 2580-81, 180 L.Ed.2d at 595. “The Court distinguished the situation in [Levine], which it characterized as holding that ‘the possibility of impossibility’ (i.e., possible FDA subsequent denial) was not enough for impossibility preemption from the case at hand, which concerned ‘the possibility of possibility’ (i.e., possible FDA prior approval).” Fulgenzi, 711 F.3d at 583 (quoting Mensing, 564 U.S. at - n. 8, 131 S.Ct. at 2581 n. 8, 180 L.Ed.2d at 596 n. 8). The Mensing Court acknowledged “the unfortunate hand that federal drug regulation has dealt” those whose pharmacies filled their prescriptions with generic metoclopramide instead of Reglan. Mensing, 564 U.S. at -, 131 S.Ct. at 2581, 180 L.Ed.2d at 596.
In response to Mensing, the FDA proposed a rule to amend generic labeling regulations. Supplemental Applications Proposing Labeling Changes for Approved Drugs and Biological Products, 78 Fed. Reg. 67985-02 (proposed Nov. 13, 2013) [hereinafter Proposed Rule] (setting deadline of January 13, 2014, for comments). The proposed rule “would create parity” between brand and generic manufacturers, granting both the ability to unilaterally improve labeling and then seek approval from the FDA. Id. at 67986.
Against this backdrop, we now turn to the facts of this case. In 1980, the FDA approved the new drug application for me-toclopramide tablets, which are designed to treat digestive tract problems, including gastroesophageal reflux disease (acid reflux). This FDA approval allowed for the manufacture and distribution of a patented formulation of the drug, which was branded Reglan. Wyeth, Inc. came to own the Reglan brand in approximately 1989[1] and *359 later sold the rights and liabilities associated with Reglan to Schwarz Pharma, Inc. in December 2001.[2] In addition to the Re-glan tablets marketed by Wyeth and Schwarz [hereinafter referred to collectively as the brand defendants], a generic formulation of the drug was manufactured and distributed by PLIVA, Inc.
In February 2004, Theresa Huck’s physician prescribed Reglan to treat her reflux. Her physician relied upon information published by the brand defendants in the Physician’s Desk Reference, which contained the FDA-approved labeling for the drug. Huck’s pharmacy filled this prescription with the PLIVA generic.
The FDA-approved labeling at the time Huck began taking metoclopramide stated “Therapy longer than 12 weeks has not been evaluated and cannot be recommended.” The label also contained a warning about possible side effects, including tardive dyskinesia. Tardive dyskinesia is a severe, often irreversible neurological disorder resulting in involuntary and uncontrollable repetitive body movements of slow or belated onset. Symptoms include “grotesque facial grimacing and open-mouthed, uncontrollable tongue movements, tongue thrusting, [and] tongue chewing.” Fisher v. Pelstring, 817 F.Supp.2d 791, 802 (D.S.C.2011). There is no known treatment or cure for tardive dyskinesia. The FDA-approved warning stated that tardive dyskinesia was expected to occur in one in every five hundred patients.
In July 2004, approximately five months after Huck began taking metoclopramide, the FDA approved additional label warning language requested by Schwarz. Printed in bold on the first line of both the “Indications and Usage” and “Dosage and Administration” sections of the label, the new language indicated, “Therapy should not exceed 12 weeks in duration.” While this language appeared on the label for Reglan, it was not published in the Physicians’ Desk Reference. Although required by federal regulations to mirror the brand defendant’s label, PLIVA did not update its metoclopramide packaging to include the new warning approved in 2004. The record is silent as to why PLIVA failed to add that warning. Neither the brand defendants nor PLIVA communicated the new label information to Huck or her physician. Huck testified she never would have taken metoclopramide had she been warned its possible side effects included a neurological disorder.
Taking an average of 2.7 pills per day, Huck continued to refill her PLIVA generic prescription until March 2006. Though Huck had been experiencing symptoms of tardive dyskinesia for some time, she was not diagnosed with the disease until June 6, 2006.
Based on growing evidence that prolonged use of metoclopramide causes tar-dive dyskinesia, on February 26, 2009, the FDA imposed heightened warnings for the drug’s packaging. The FDA required the following black-box warning — its strongest — for metoclopramide:
Chronic treatment with metoclopram-ide can cause tardive dyskinesia, a serious movement disorder that is often irreversible. The risk of developing tardive dyskinesia increases with the duration of treatment and the total cumulative dose. * * *
There is no known treatment for tar-dive dyskinesia; however, in some patients symptoms may lessen or resolve *360 after metoclopramide treatment is stopped. * * *
Prolonged treatment (greater than 12 weeks) with metoclopramide should be avoided in all but rare cases where therapeutic benefit is thought to outweigh the risks to the patient of developing tardive dyskinesia.
On May 27, 2008, Huck filed suit against the brand defendants, PLIVA, and several other defendants no longer involved in the case.[3] Her petition did not distinguish between the brand defendants and PLIVA, instead referring to them collectively as “manufacturing defendants.” In total, Huck pled thirteen claims against these manufacturing defendants: (1) strict products liability, (2) strict liability for a manufacturing defect, (3) strict liability for a design defect, (4) breach of express warranty, (5) breach of implied warranties (based on inadequate warnings), (6) negligence (based on inadequate warnings), (7) negligent misrepresentation, (8) breach of undertaking a special duty, (9) fraud and misrepresentation, (10) constructive fraud, (11) fraud by concealment, (12) violation of the Iowa Unfair Trade Practices Act, and (13) intentional infliction of emotional distress.
Huck filed a “Notice of Product Identification” on October 6 admitting she ingested only generic metoclopramide manufactured by PLIVA. In response, the brand defendants moved for summary judgment. Huck filed no resistance. On March 2, 2009, the district court granted the brand defendants’ unresisted motion for summary judgment on all claims. The district court noted it was undisputed that the brand defendants “did not manufacture or sell the generic metoclopramide ingested by [Huck]” and, citing Mulcahy, concluded Huck’s claims against the brand defendants therefore failed as a matter of law. Huck did not file a motion for reconsideration or immediately appeal the ruling.
For the next two and one-half years, Huck pursued her claims against PLIVA, the only remaining defendant. On February 26, 2010, PLIVA filed two motions for summary judgment, one arguing no genuine issues of material fact existed and the other arguing Huck’s claims were preempted by federal law. On April 12, the district court ruled on PLIVA’s motions. First, the district court rejected PLIVA’s preemption argument. The district court also ruled that a factual dispute existed relating to whether Huck would not have ingested metoclopramide had she received (or, if the learned intermediary doctrine is applied, her physician received[4] ) an adequate warning. The district court then dismissed several of Huck’s claims,[5] but her common law claims for breach of *361 the implied warranty of merchantability, negligence (based on failure to warn), negligent misrepresentation, fraud and misrepresentation, constructive fraud, and fraud by concealment were allowed to proceed. Trial was set for February 7, 2011.
On December 14, 2010, PLIVA moved to stay all deadlines and continue the trial based on the United States Supreme Court’s grant of certiorari in Mensing, which consolidated two lawsuits involving state tort-law claims against generic meto-clopramide manufacturers. 564 U.S. at -, 131 S.Ct. at 2572-73, 180 L.Ed.2d at 586-87. The district court granted the stay, acknowledging that two of the cases it had relied on in its denial of PLIVA’s preemption motion were at issue in the Mensing appeal. See id. at -, 131 S.Ct. at 2573, 180 L.Ed.2d at 587.
After Mensing held federal preemption precluded plaintiffs’ failure-to-warn claims, see id. at -, 131 S.Ct. at 2580-81, 180 L.Ed.2d at 595, PLIVA again moved to dismiss Huck’s claims based on federal preemption. Additionally, on September 26, 2011, Huck filed a “Motion for Relief’ from the 2009 summary judgment dismissing the brand defendants. Huck invoked the district court’s “inherent power to correct interlocutory errors” and argued Mensing’s holding that generic manufacturers do not have the ability to unilaterally strengthen drug labels necessarily shifted responsibility for generic manufacturers’ insufficient labeling to brand manufacturers, who are able to unilaterally strengthen labels. Asserting the Mensing decision overturned prior precedent, Huck asked the court to reinstate her claims against the brand defendants.
On January 9, 2012, the district court ruled on the pending motions. Regarding Huck’s motion for relief, the district court highlighted that it granted the brand defendants’ summary judgment “based upon the rule in Iowa ‘that a Plaintiff in a products liability action bears the burden of proving the Defendant manufactured or supplied the product that caused the injury.’ Mulcahy v. Eli Lilly & Co., 386 N.W.2d 67, 69 (Iowa 1986).” The court further concluded Huck’s argument based on Mensing was meritless and denied the motion for relief as to the brand defendants. The district court granted PLIVA summary judgment on grounds of federal conflict preemption.
Huck appealed both the district court’s grant of summary judgment in favor of PLIVA and its denial of her motion for relief against the brand defendants. We transferred the case to the court of appeals, which affirmed the district court’s rulings. The court of appeals held Huck’s claims against PLIVA “attack the adequacy of the labeling” and therefore are preempted because they “fall[ ] within Mensing’s sphere.” The court of appeals specifically rejected Huck’s argument that PLIVA can be held liable for failing to update its label to provide the additional bolded warning approved in 2004, reasoning federal law prohibits private attempts to enforce a generic manufacturer’s obligation to match the brand manufacturer’s label. As to the brand defendants, the court of appeals noted Huck failed to resist their motion for summary judgment, file a postjudgment motion, or immediately appeal the summary judgment. Consequently, the court of appeals concluded the only preserved issue relating to that summary judgment ruling is the issue explicitly decided by the district court: whether the brand defendants owed Huck a duty under Iowa law when she did not ingest a product manufactured or sold by them. The court of appeals held Mensing did not alter state-law principles requiring the dismissal of a claim brought against a defendant whose product plaintiff never used.
*362 We granted Huck’s application for further review.
II. Standard of Review.
We review rulings that grant summary judgment for correction of errors at law. Parish v. Jumpking, Inc., 719 N.W.2d 540, 542 (Iowa 2006). Summary judgment is appropriate when there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law. Iowa R. Civ. P. 1.981(3). “A fact is material if it will affect the outcome of the suit, given the applicable law.” Parish, 719 N.W.2d at 543. “An issue of fact is ‘genuine’ if the evidence is such that a reasonable finder of fact could return a verdict or decision for the non-moving party.” Id. We view the evidence in the light most favorable to the nonmov-ing party. Id. Summary judgment is properly granted when the moving party shows “the nonmoving party has no evidence to support a determinative element of that party’s claim.” Id.
We may review the issues actually decided in a ruling granting an unresisted motion for summary judgment when the nonmoving party filed a postjudgment motion that gave the district court the opportunity to correct the alleged error. See Cooksey v. Cargill Meat Solutions Corp., 831 N.W.2d 94, 98-99 (Iowa 2013); id. at 107 (Mansfield, J., dissenting); Otterberg v. Farm Bureau Mut. Ins. Co., 696 N.W.2d 24, 28 (Iowa 2005) (noting the party moving for summary judgment has the burden “to show the district court that. there was no genuine issue of material fact and that it was entitled to a judgment as a matter of law”); Bill Grunder’s Sons Constr., Inc. v. Ganzer, 686 N.W.2d 193, 197-98 (Iowa 2004) (“[T]he nonmovant must at least preserve error by filing a motion following entry of [the unresisted summary] judgment, allowing the district court to consider the claim of deficiency.”).
III. Analysis.
A. Whether Any of Huck’s Claims Against PLIVA Survive Mensing. We must decide whether the district court correctly ruled that all of Huck’s claims against PLIVA are preempted by Mens-ing. Applying Mensing, the district court ruled Huck’s claims against PLIVA are preempted because it was impossible for PLIVA to alter its label. The court of appeals agreed. Huck argues Mensing preempts only claims that require the generic manufacturer to vary its labeling from that of the branded drug. She points out that PLIVA failed to update its label in 2004 to include the FDA-approved warning stating, “Therapy should not exceed 12 weeks in duration.” Mensing did not decide whether that claim is preempted. The Court of Appeals for the Sixth Circuit in Fulgenzi, however, recently adjudicated this very issue and squarely held Mensing does not preempt claims based on the generic manufacturer’s failure to update its label warning with the language the FDA approved in 2004. Fulgenzi, 711 F.3d at 584. As the Sixth Circuit observed, “not only could PLIVA have independently updated its labeling to match [the warning added in 2004], it had a federal duty to do so.” Id. (citation omitted). We find Ful-genzi persuasive and hold Huck’s claims survive preemption to the extent they are based on PLIVA’s failure to adopt the additional warning language approved by the FDA in 2004.
The federal preemption doctrine derives from the Supremacy Clause of the Federal Constitution. See Ackerman v. Am. Cyanamid Co., 586 N.W.2d 208, 211 (Iowa 1998). Under the doctrine of conflict preemption, “[when] state and federal law directly conflict, state law must give *363 way.” Mensing, 564 U.S. at -, 131 5.Ct. at 2577, 180 L.Ed.2d at 592 (internal quotation marks omitted). But, “[t]here is a presumption against preemption which counsels a narrow construction of preemption provisions.” Ackerman, 586 N.W.2d at 213. We must evaluate each of Huck’s surviving claims[6] — breach of the implied warranty of merchantability, negligence (based on failure to warn), negligent misrepresentation, fraud and misrepresentation, constructive fraud, and fraud by concealment — “to determine if it is impossible for PLIVA to comply with both the state-law duties underlying those claims and its federal labeling duties” or if state law “would obstruct the purposes and objectives of federal drug labeling regulation.” See Levine, 555 U.S. at 568, 573, 129 S.Ct. at 1196, 1199, 173 L.Ed.2d at 62, 65.
We will first evaluate her claims to determine if they make it impossible for PLIVA to comply with both state and federal law. Next, we will decide if her claims pose an obstacle to the purposes and objectives of Congress. Finally, we will consider PLIVA’s argument that Huck’s claims violate a federal law prohibiting private enforcement of the FDCA.[7]
*364 1. Impossibility preemption. We first consider Huck’s negligence claim based on PLIVA’s failure to warn. Huck concedes her failure-to-warn claim is preempted to the extent it required PLI-VA to adopt a label different than that of the approved brand label, but argues she can base her common law negligence claim on PLIVA’s failure to adopt the language approved in the 2004 warning against use of metoclopramide for longer than twelve weeks. We agree.
The facts of this case present a narrow path around Mensing preemption. Once the additional warning language was approved by the FDA in July 2004, PLIVA needed only to go through the “changes being effected” process to revise its label to match the updated brand-name label. See Mensing, 564 U.S. at -, 131 S.Ct. at 2575, 180 L.Ed.2d at 589-90 (citing the FDA’s interpretation of 21 C.F.R. § 314.94(a)(8)(iv)). This process allows manufacturers to update their label -without waiting for FDA approval. Id. at -, 131 S.Ct. at 2575, 180 L.Ed.2d at 589. Though the FDA could have rejected PLIVA’s request after the fact, such a rejection would have been unlikely. Cf. Levine, 555 U.S. at 571, 129 S.Ct. at 1198, 173 L.Ed.2d at 64 (“[A]bsent clear evidence that the FDA would not have approved a change to [defendant’s] label, we will not conclude that it was impossible for [defendant] to comply with both federal and state requirements.”). Accordingly, it was not impossible for PLIVA to update its label and send informational letters consistent with the updated language, warning healthcare professionals and consumers that metoclopramide therapy should not exceed twelve weeks. To the contrary, PLIVA had a federal duty to match its label to Wyeth’s. See 21 U.S.C. § 331(a) (prohibiting the introduction into interstate commerce any drug that is mis-branded); 21 C.F.R. § 314.94(a)(8)(iii) (requiring generic applicant to match label of brand drug); 21 C.F.R. § 314.150(b)(10) (providing FDA may withdraw drug approval if the generic’s label “is no longer consistent with that for [the brand-name]”); see also Fulgenzi, 711 F.3d at 584 (“[Compliance with federal and state duties was not just possible; it was required.”). We therefore conclude Huck’s state-law negligent failure-to-warn claim is not preempted by federal labeling regulations to the extent it is based on PLIVA’s failure to adopt the additional warning language approved in 2004. A growing number of courts have reached the same conclusion.[8]
*365 Moving to Huck’s remaining claims, we note at the outset that “there is no general, inherent conflict between federal preemption [sic] of state warning requirements and the continued vitality of state common-law damages actions.” Cipollone v. Liggett Grp., Inc., 505 U.S. 504, 518, 112 S.Ct. 2608, 2618, 120 L.Ed.2d 407, 424 (1992). “Of course any direct challenge to the adequacy of a label or warning is preempted.” Ackerman, 586 N.W.2d at 213. But, “[w]e also examine whether a claim is merely another way of alleging the label or warning was inadequate. Such an indirect challenge is also preempted.” Id. If Huck’s claims against PLIVA do not require the company to change its labeling to differ from that of the approved label, they are not preempted. See id. (“[OJur task remains to identify whether [plaintiffs] claims are predicated upon labeling and packaging requirements in addition to and different from those required by [federal law].”).
Huck argues her claims for negligent testing and postmarket surveillance thus are not preempted. But, “merely to call something a design or testing claim does not automatically avoid [the] preemption clause.” Id. at 214. The line between a claim for mislabeling and a claim for negligent testing is “razor thin.” See id.
[T]he rule is that a claim based on negligent or inadequate testing will not be considered a disguised label-based challenge if adequate testing would have caused the manufacturer to alter the product itself. Conversely, the rule is that if defendant could remedy any problems with its product, that it learned about through adequate testing, by altering the product’s label rather than by changing the product, then any challenge concerning negligent testing is preempted.
Wright v. Am. Cyanamid Co., 599 N.W.2d 668, 673 (Iowa 1999).
Federal drug regulation adds a wrinkle to the application of this rule: generic manufacturers are prohibited from altering the composition of a drug because they must mirror the formulation of the brand-manufacturer drug. See, e.g., 21 U.S.C. § 355(j)(2)(A) (requiring bioequiva-lence); id. § 355(j)(2)(A)(ii), (iii) (requiring generic drug to have the same “active ingredients,” “route of administration,” “dosage form,” and “strength” as its brand-name counterpart); id. § 355(j)(8)(B) (requiring the same “rate and extent of absorption”). Moreover, both generic and brand manufacturers are prohibited from making major changes to the “qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application” after their drug is approved. 21 C.F.R. § 314.70(b)(2)®.
In light of these regulations, the only way for PLIVA to avoid liability for negligent testing would be to withdraw from the market. This issue is addressed by Mutual Pharmaceutical Co. v. Bartlett, 570 U.S. -, - 133 S.Ct. 2466, 2477, 186 L.Ed.2d 607, 622-23 (2013). In Bartlett, the Supreme Court rejected the “stop *366 selling” argument because “if the option of ceasing to act defeated a claim of impossibility, impossibility pre-emption [sic] would be ‘all but meaningless.’ ” Id. at -, 133 S.Ct. at 2477-78, 186 L.Ed.2d at 622 (quoting Mensing, 564 U.S. at -, 131 S.Ct. at 2579, 180 L.Ed.2d at 594) (noting “[j]ust as the prospect that a regulated actor could avoid liability under both state and federal law by simply leaving the market did not undermine the impossibility analysis in [Mensing ], so it is irrelevant to our analysis here”). But, as with her failure-to-warn claim, we conclude Huck’s negligent-testing and postmarket-surveillance claims avoid preemption to the extent the claims are based on PLIVA’s failure to adopt the 2004 label change. Cf. Wright, 599 N.W.2d at 675 (concluding negligent-testing claim was “a disguised label-based claim” preempted by federal law).
Huck next argues her claim of breach of the implied warranty of merchantability based on warning defects escapes Mensing preemption because (1) metoclopramide was unfit “for the ordinary purposes for which such goods are used” — namely, for prolonged therapy; (2) PLIVA did not include the revised 2004 label limiting the duration of use to twelve weeks; and (3) metoclopramide did not conform to the statements of fact that appear on its label. See Iowa Code § 554.2314(c), (e), (f) (2005). Once more, we agree this claim may proceed if she is able to ground it on PLIVA’s failure to adopt the 2004 additional approved warning. See Fisher, 817 F.Supp.2d at 821 (denying PLIVA’s motion for summary judgment on implied warranty of merchantability because “the Court does not find as a matter of law that long-term use was not an ordinary purpose for which metoclopramide was used”); see also Wright v. Brooke Grp. Ltd., 652 N.W.2d 159, 182 (Iowa 2002) (citing the Restatement (Third) of Torts: Prods. Liab. § 2(b)-(c), at 14 (1998), as authority to allow breach of the implied warranty of merchantability claim based on inadequate warnings); cf. Ackerman, 586 N.W.2d at 213-14 (dismissing claim of breach of implied warranty of merchantability based on federal preemption).
Finally, Huck appeals the dismissal of her claims alleging fraud, misrepresentation, constructive fraud, and fraud by concealment. Our common law recognizes fraud claims by a consumer against a product manufacturer who “made misleading statements of fact intended to influence consumers” or “made true statements of fact designed to influence consumers and subsequently acquire[d] information rendering the prior statements untrue or misleading.” Brooke Grp. Ltd., 652 N.W.2d at 177 & n. 4 (declining to decide whether such claims were preempted). We conclude her fraud and misrepresentation claims escape preemption to the extent they are based on the additional 2004 warning language PLIVA failed to adopt.
2. Pmposes and objectives analysis. Next, we must consider whether state tort suits against generic manufacturers would frustrate the purposes and objectives of Congress, thus warranting preemption.[9] In Levine, the Court held suits against Reglan manufacturers would not obstruct the purposes and objectives of federal drug labeling regulation. 555 U.S. at 573, 129 S.Ct. at 1199, 173 L.Ed.2d at 65. We reach the same conclusion with respect to Huck’s claims against PLIVA.
*367 Levine recognized that Congress has not provided a federal remedy for consumers harmed by prescription drugs and, as such, “state law offers an additional, and important, layer of consumer protection that complements FDA regulation.” Id. at 574, 579, 129 S.Ct. at 1200, 1202, 173 L.Ed.2d at 66, 69 (noting additionally that, “[i]f Congress thought state-law suits posed an obstacle to its objectives, it surely would have enacted an express preemption [sic] provision at some point during the FDCA’s 70-year history”); see also Bates v. Dow Agrosciences LLC, 544 U.S. 431, 451, 125 S.Ct. 1788, 1802, 161 L.Ed.2d 687, 707 (2005) (“Private remedies that enforce federal misbranding requirements would seem to aid, rather than hinder, the functioning of [federal law].”). The Levine Court’s reasoning on this issue applies to state tort claims against both generic and brand manufacturers:
State tort suits uncover unknown drug hazards and provide incentives for drug manufacturers to disclose safety risks promptly. They also serve a distinct compensatory function that may motivate injured persons to come forward with information. Failure-to-warn actions, in particular, lend force to the FDCA’s premise that manufacturers, not the FDA, bear primary responsibility for their drug labeling at all times.
555 U.S. at 579, 129 S.Ct. at 1202, 173 L.Ed.2d at 68-69.
The Sixth Circuit’s decision in Fulgenzi reinforces our conclusion that Huck’s claims against PLIVA do not frustrate congressional goals. In Fulgenzi, the court considered the differences between brand and generic manufacturers, singling out the “promotion of generic drugs, and the attendant reduction in costs” as “[t]he most easily identifiable policy” of the FDCA. 711 F.3d at 585. “Permitting state tort actions to go forward against generic-drug manufacturers [as opposed to brand manufacturers], the argument goes, would increase costs and reduce usage.” Id. Yet, the Fulgenzi court held this hypothetical difference does not justify preemption. Id. Citing the Mensing dissenters’ observation that “the inability to sue for inadequate warnings may actually reduce consumer demand,” Fulgenzi reasoned “[t]his is an empirical question, and we should not affirmatively answer on the basis of mere speculation about Congressional purposes.” 711 F.3d at 585. The court concluded:
It is hard to see how permitting state tort suits to go forward against sameness-violating generic defendants frustrates federal policies where permitting suits against FDA — compliant branded defendants does not. A vague policy of encouraging use of generic drugs, untethered from the structure of the Act, is not enough to support purposes-and-objectives preemption.
Id. at 586 (citation omitted). We agree with this analysis and hold Huck’s claims survive impossibility preemption.
3. Private right of action. PLI-VA argues Huck’s claims are merely attempts to enforce the FDCA, which 21 U.S.C. § 337(a) disallows. The court of appeals and district court agreed. That section states: “[A]ll such proceedings for the enforcement, or to restrain violations, of this chapter shall be by and in the name of the United States.” 21 U.S.C. § 337(a). This provision ensures private suits do not “deprive the [FDA] of the ability to use its enforcement authority to achieve a delicate balance of statutory objectives.” Fulgenzi, 711 F.3d at 586. PLIVA reads § 377(a) to mean “private litigants are barred from asserting claims involving violations of the FDCA or FDA’s implementing regulations.” We disagree and instead conclude Huck’s claims — as limited by our decision *368 today — are based on traditional state tort law principles that supplement federal requirements.
This case presents us with a “situation[ ] implicating ‘federalism concerns and the historic primacy of state regulation of matters of health and safety,’ ” a situation governed by a presumption against preemption. Buckman Co. v. Plaintiffs’ Legal Comm., 581 U.S. 341, 348, 121 S.Ct. 1012, 1017, 148 L.Ed.2d 854, 861 (2001) (quoting Medtronic, Inc. v. Lohr, 518 U.S. 470, 485, 116 S.Ct. 2240, 2250,135 L.Ed.2d 700, 715 (1996)). “Where [a] claim is based on traditional state-tort-law principles, the lack of a private cause of action within a federal regulatory scheme will not preempt the claim for damages (even if state regulations might be preempted).” Fulgenzi, 711 F.3d at 586; accord Silkwood v. Kerr-McGee Corp., 464 U.S. 238, 255, 104 S.Ct. 615, 625, 78 L.Ed.2d 443, 457 (1984) (“[T]raditional principles of state tort law ... apply with full force unless they [are] expressly supplanted.”). Likewise, an independent state law cause of action that parallels federal requirements is permissible. See Riegel v. Medtronic, Inc., 552 U.S. 312, 330, 128 S.Ct. 999, 1011, 169 L.Ed.2d 892, 906 (2008) (“[The express preemption provision in the Medical Device Amendments to the FDCA] does not prevent a State from providing a damages remedy for claims premised on a violation of FDA regulations; the state duties in such a case ‘parallel,’ rather than add to, federal requirements.”); Lohr, 518 U.S. at 495, 116 S.Ct. at 2255, 135 L.Ed.2d at 721 (“Nothing in [the statute] denies Florida the right to provide a traditional damages remedy for violations of common-law duties when those duties parallel federal requirements.”). “But if the claims ‘exist solely by virtue of the regulatory scheme, they are preempted.” Fulgenzi, 711 F.3d at 586 (quoting Buckman, 531 U.S. at 353, 121 S.Ct. at 1020, 148 L.Ed.2d at 864 (finding “fraud on the FDA” claim preempted because “the existence of ... federal enactments is a critical element” of plaintiffs case)).
Huck’s petition does not attempt to allege a prohibited private federal cause of action under the FDCA. Rather, she alleges state common law tort and warranty theories that exist regardless of whether the FDCA required a duty of sameness. Indeed, Huck could try her claims without reference to the FDCA. Cf. Fulgenzi, 711 F.3d at 588 (noting “the logic of Buckman would encourage exclusion of evidence of federal-law violations where possible”). Fundamentally, with variations on a theme, she asserts:
(1) PLIVA had a duty to warn her that she should not take metoclopramide for longer than twelve weeks.[10]
(2) PLIVA breached this duty.
(3) Huck took metoclopramide for longer than twelve weeks because she was not instructed otherwise.
*369 (4) Huck suffered damages as a result of ingesting metoclopramide for more than twelve weeks.
Neither the federal duty of sameness nor the duty to report safety risks to the FDA are “critical element[s]” of her state law claims.[11] See Buckman, 531 U.S. at 353, 121 S.Ct. at 1020, 148 L.Ed.2d at 864. Federal law has limited the way in which she can frame her claim: she cannot raise a claim based on labeling that would require PLIVA to unilaterally strengthen its label. She has managed to avoid that difficulty because PLIVA did not include the additional 2004 approved language. In sum, Huck’s claims fit into a “narrow gap”: she is suing for conduct that violates the FDCA, but she is not suing because the conduct violates the FDCA. See In re Medtronic, Inc., 623 F.3d 1200, 1204 (8th Cir.2010) (internal quotation marks omitted).
B. The Brand Defendants. We next address whether the district court correctly entered summary judgment dismissing Huck’s claims against the brand defendants based on the undisputed fact that Huck consumed only the generic formulation sold by PLIVA — their competitor— and never used Reglan. The district court granted the brand defendants’ unresisted motion for summary judgment, applying our decision in Mulcahy. The court of appeals affirmed, stating, “To the minimal extent Huck argues Mulcahy is either distinguishable or not applicable, we disagree and find the district court’s application of Mulcahy is correct.”
Mulcahy applied a well-settled requirement of Iowa law — the plaintiff must prove injury caused by a product sold or supplied by the defendant. 386 N.W.2d at 76. This long-standing requirement bars Huck’s recovery from the manufacturers of a brand she never used.[12] Under Iowa law, manufacturers owe duties to those harmed by use of their products. We decline to change Iowa law to impose a new duty on manufacturers to those who never used their products and were instead harmed by use of a competitor’s product. The FDA has responded to Mensing through a proposed rule to allow generic manufacturers to update their labeling on their own, regardless of the brand manufacturer labeling. See Proposed Rule, 78 Fed.Reg. at 67985. The rule change would vitiate the preemption defense of generic manufacturers. This is the appropriate way to address the unfairness resulting from Mens-ing, rather than turning Iowa tort law upside down.
Huck argues we should reinstate her claims against the brand defendants because PLIVA was required to use the same warnings that accompanied Reglan. An overwhelming majority of courts adjudicating this issue have affirmed judgments or granted dispositive motions dismissing claims against the brand defendants when the plaintiff used only the generic formulation. See, e.g., In re Darvocet, Darvon and Propoxyphene *370 Prods. Liab. Litig., 756 F.3d 917, 937-40, 2014 WL 2959271, *17-18 (6th Cir. June 27, 2014) (affirming dismissal of claims against brand defendants when plaintiffs consumed only generic painkiller; applying laws of twenty-two states in a multidistrict litigation action with sixty-eight lawsuits); Moretti v. Wyeth, Inc., — Fed.Appx. -, -, 2014 WL 2726886, at *1 (9th Cir. June 17, 2014) (affirming summary judgment for brand defendants based on Nevada law); Lashley v. Pfizer, Inc., 750 F.3d 470, 476-78 (5th Cir.2014) (affirming summary judgments for brand defendants because plaintiffs ingested only generic metoclopramide); Strayhom v. Wyeth Pharm., Inc., 737 F.3d 378, 406 (6th Cir.2013) (noting “every federal court of appeals to consider this issue has held that brand-name manufacturers are not liable to plaintiffs who are injured by a generic manufacturer’s drug”); Schrock v. Wyeth, Inc., 727 F.3d 1273, 1284-86 (10th Cir.2013) (stating “the courts of other states have overwhelmingly rejected the very theory advanced by the Schrocks”); Guarino v. Wyeth, LLC, 719 F.3d 1245, 1252 (11th Cir.2013) (“[T]he overwhelming national consensus — including ... the vast majority of district courts around the country to consider the question — is that a brand-name manufacturer cannot be liable for injuries caused by the ingestion of the generic form of a product.”); Bell v. Pfizer, Inc., 716 F.3d 1087, 1092-94 (8th Cir. 2013) (affirming summary judgment for brand defendants because Bell never used Reglan and noting “ ‘[a]n overwhelming majority of courts considering this issue,’ including the Eighth Circuit, have rejected Bell’s theory of liability” (quoting Mensing, 588 F.3d at 613)); Foster v. Am. Home Prods. Corp., 29 F.3d 165, 170 (4th Cir.1994) (“There is no legal precedent for using a name brand manufacturer’s statements about its own product as a basis for liability for injuries caused by other manufacturers’ products, over whose production the name brand manufacturer had no control.”). As the Sixth Circuit Court of Appeals summarized, “almost every court has ... reasoned] that a brand manufacturer does not owe a duty to a consumer unless the consumer actually used the brand manufacturer’s product.” Darvocet, 756 F.3d at 925, 2014 WL 2959271, at *4 (citing Victor E. Schwartz, et. al., Warning: Shifting Liability to Manufacturers of Brand-Name Medicines When the Harm Was Allegedly Caused by Generic Drugs Has Severe Side Effects, 81 Fordham L.Rev. 1835, 1857-58 (2013) [hereinafter Schwartz], which catalogs cases following the majority trend).
The Court of Appeals for the Tenth Circuit recently discussed three principal rationales used by courts, concluding “brand-name manufacturers are not liable to consumers of generic drugs”:
First, they based their view on traditional common law tort principles under which a manufacturer is liable for injuries caused by its own product. See, e.g., Mensing, 588 F.3d at 604, 613 (holding name brand manufacturers liable for harm caused by generic manufacturers “stretches the concept of foreseeability too far” (quotation and alteration omitted)). Second, they reason that brand-name manufacturers’ warnings and representations do not create a basis for liability to consumers of competitors’ products because brand-name manufacturers only “intend[ ] to communicate with their customers, not the customers of their competitors.” Id. at 613 n. 9; see also Stanley v. Wyeth, Inc., 991 So.2d 31, 34 (La.Ct.App.2008) (“A manufacturer cannot reasonably expect that *371 consumers will rely on the information it provides when actually ingesting another company’s drug.”). Finally, they conclude that public policy considerations weigh against holding name-brand competitors liable for injuries caused by their generic competitor’s drug. See, e.g., Foster, 29 F.3d at 170 (citing the expense in development, research, and promotion undertaken by name-brand manufacturers not undertaken by generic manufacturers).
Schrock, 727 F.3d at 1285. We agree with each rationale.
In Mulcahy, we squarely held that “under Iowa common law a plaintiff in a products liability case must prove that the injury-causing product was a product manufactured or supplied by the defendant.” 386 N.W.2d at 76. The brand defendants correctly argue this “product-identification requirement is decisive here because it is undisputed [Huck] did not use brand defendants’ product, but instead used a generic equivalent product that was manufactured and sold by another company” — PLIVA—their competitor. We see no indication Congress intended to alter common law principles of causation to create liability for injuries caused by use of a competitor’s product. See Norfolk Redev. & Hous. Auth. v. Chesapeake & Potomac Tel. Co. of Va., 464 U.S. 30, 35, 104 S.Ct. 304, 307, 78 L.Ed.2d 29, 34 (1983) (“It is a well-established principle of statutory construction that ‘[t]he common law ... ought not to be deemed to be repealed, unless the language of a statute be clear and explicit for this purpose.’” (quoting Fairfax’s Devisee v. Hunter’s Lessee, 11 U.S. (7 Cranch) 603, 623, 3 L.Ed. 453, 459-60 (1812))). “Absent clearer indications, we cannot impute to Congress an intent to repeal, sub silentio, this deeply-rooted legal principle.” State Eng’r v. S. Fork Band of Te-Moak Tribe of W. Shoshone Indians of Nev., 339 F.3d 804, 814 (9th Cir.2003) (citing Norfolk, 464 U.S. at 35-36, 104 S.Ct. at 307, 78 L.Ed.2d at 34, and discussing common law doctrine of prior exclusive jurisdiction). We have never relaxed the product-identification causation requirement to impose liability for injuries caused by the use of a competitor’s product, and we decline to do so here. Cf. Mulcahy, 386 N.W.2d at 76 (“The imposition of liability upon a manufacturer for harm that it may not have caused ... is an act more closely identified as a function assigned to the legislature under its power to enact laws.”).
Huck contends the product-identification causation requirement does not apply to her negligent misrepresentation and fraud claims. We disagree. The plaintiffs in Mulcahy sued pharmaceutical companies for personal injuries resulting from the ingestion of DES, a synthetic estrogen compound. Id. at 69. The plaintiffs “set forth theories of recovery against the defendants based upon strict liability, negligence, misrepresentation, breach of warranties, alternate liability, enterprise liability, market share liability, and concert of action.” Id. (emphasis added). We held the product-identification causation requirement applied “ ‘[regardless of the theory which liability is predicated upon.’ ” Id. at 72-73 (quoting Annotation, Products Liability: Necessity and Sufficiency of Identification of Defendant Manufacturer or Seller of Product Alleged to Have Caused Injury, 51 A.L.R.3d 1344 § 2[a], at 1349 (1973)).
Moreover, the tort of negligent misrepresentation does not apply to sellers of products but rather is limited to those in the business or profession of supplying information for the guidance of others. See Pitts v. Farm Bureau Life Ins. Co., 818 N.W.2d 91, 111-12 (Iowa 2012). “We have found accountants, appraisers, school *372 guidance counselors and investment brokers all fall within this class of potential defendants.” Id. at 112 (collecting cases). “However, we have refused to allow a suit for negligent misrepresentation where the defendant was a retailer in the business of selling and servicing merchandise....” Id. Federal courts applying Iowa law likewise hold the tort of negligent misrepresentation does not apply to sellers of products:
Even if Plaintiffs negligence actions were not barred by the contract’s limitation of remedies, Defendant would be entitled to summary judgment on Plaintiffs’ negligent misrepresentation claim. Plaintiffs concede that Meier v. Alfa-Laval, Inc., 454 N.W.2d 576 (Iowa 1990) applies in this case. The Meier court held that liability based on the tort of negligent misrepresentation was limited to those persons in the business of supplying information versus persons who give information incidental to selling goods. Id. at 581. Clearly Defendant’s business is more accurately described as selling goods than it is supplying information. In addition, even if Defendant were in the business of providing information, Plaintiffs’ claim would fail in that Defendant did not supply “false information for the guidance of others in their business transactions.” Restatement (Second) of Torts § 552(1) [ (1965) ]. Thus, summary judgment is appropriate as to Plaintiffs’ negligent misrepresentation claim.
Nelson v. DeKalb Swine Breeders, Inc., 952 F.Supp. 622, 628 (N.D.Iowa 1996), aff'd sub nom. Brunsman v. DeKalb Swine Breeders, Inc., 138 F.3d 358, 360 (8th Cir. 1998).
Courts in the Reglan litigation have applied the same limiting principles to dismiss negligent misrepresentation claims against brand name manufacturers when the plaintiff used only the generic product. See, e.g., Baymiller v. Ranbaxy Pharm., Inc., 894 F.Supp.2d 1302, 1309-10 (D.Nev.2012) (noting that Nevada law “limited the application” of section 552 to business transactions and concluding that because plaintiff did not purchase the brand-name product, there was no business transaction and section 552 did not apply); Strayhorn v. Wyeth Pharm., Inc., 882 F.Supp.2d 1020, 1030 (W.D.Tenn.2012) (rejecting plaintiffs’ claims of negligent and fraudulent representation against brand manufacturers when the Tennessee Supreme Court had declined to apply section 552 to fraudulent misrepresentation or in products liability actions previously), aff'd, 737 F.3d 378, 383 (6th Cir.2013); Mosley v. Wyeth, Inc., 719 F.Supp.2d 1340, 1345-46 (S.D.Ala.2010) (finding that section 552 did not apply in a products liability action against brand manufacturers and stating, “Under the restatement, drug manufacturers cannot be classed, at least not in the same sense as accountants and real estate appraisers, as ‘persons [who] make it a part of their business ... to supply information for the guidance of others in their business transactions,’” and concluding, “under the facts of this case Wyeth and Schwarz did not engage in any business transaction with the Mos-leys” (alternation in original) (citations omitted)); see also Darvocet, 756 F.3d at 937 - 40, 2014 WL 2959271, at *16-18 (“After conducting a state-by-state Erie [R.R. Co. v. Tompkins, 304 U.S. 64, 58 S.Ct. 817, 82 L.Ed. 1188 (1938) ] analysis, we conclude that the highest courts in each of the 22 implicated states would not recognize Plaintiffs’ misrepresentation claims under their respective state laws.”). We too decline to extend the tort of negligent misrepresentation to the brand defendants when Huck used only the generic drug sold by their competitor.
We did not retreat from the product-identification causation requirement for *373 fraud cases in Brooke Group Ltd., as Huck argues. Rather, we noted the general rule that “a manufacturer’s failure to warn or to disclose material information does not give rise to a fraud claim.” Id. at 177. We noted two exceptions: “where the manufacturer (1) has made misleading statements of fact intended to influence consumers, or (2) has made true statements of fact designed to influence consumers and subsequently acquires information rendering the prior statements untrue or misleading.” Id. (citing Restatement (Second) of Torts § 551(2)(b)-(c), at 119 (1977)). But, the exceptions were expressly based on the existence of the relationship between the “customer/buyer and manufacturer,” a relationship that created a duty. Id. We never held or suggested a fraud claim could be brought by a plaintiff against a manufacturer who owed the plaintiff no duty, as we conclude is the case here. Our decision in Brooke Group Ltd. also forecloses another liability theory urged by Huck on appeal: “Good Samaritan” liability for a voluntary undertaking. See id. at 177-78 (holding marketing and advertising on the health effects of smoking are not an “undertaking” within the scope of Restatement (Second) of Torts section 328).
Huck argues we should revisit Mulcahy in light of our adoption of section 7[13] of the Restatement (Third) of Torts: Liability for Physical and Emotional Harm, at 77 (2010) in Thompson v. Kaczinski, 774 N.W.2d 829, 835 (Iowa 2009). We disagree. Thompson was not a products liability case, and we have not applied section 7 of the Restatement (Third) of Torts in products liability actions. Rather, in products liability actions, we turn to the Products Restatement. See Brooke Grp. Ltd., 652 N.W.2d at 167. Huck cannot evade the proof requirements of Iowa products liability law merely by labeling her claim as a common law negligent failure-to-warn theory. Her claims arise from injuries from her use of a product — PLIVA’s generic metoclopramide. Products liability law broadly refers to the legal responsibility for injury resulting from the use of a product. Bingham v. Marshall & Huschart Mach. Co., 485 N.W.2d 78, 79 (Iowa 1992). It encompasses the theories of negligence, strict liability and breach of warranty. Id. Although each is a separate and distinct theory of recovery, the same facts often give rise to all three claims. See id. “The underlying theories ordinarily concern improper design, inadequate warnings, or mistakes in manufacturing.” Smith v. Air Feeds, Inc., 519 N.W.2d 827, 830 (Iowa Ct.App.1994) (emphasis added). Thus, the Products Restatement applies to this case and its specific provisions control over general tort principles found in the Restatement (Third) of Torts provisions adopted in Thompson.
Moreover, section 7 of the Restatement (Third) of Torts addresses duty, not causation. See Restatement (Third) of Torts: Liab. for Physical Harm § 7, at 77. We have never applied section 7 to eliminate the requirement that the plaintiff prove her injuries were caused by a product sold or supplied by the defendant or to impose liability for injuries caused by a competitor’s product. Nor has any other appellate court in the country. The product-identification requirement applied in Mulcahy re *374 mains good law. The Sixth Circuit Court of Appeals, applying Nebraska law, expressly rejected the argument that section 7 supported imposing liability on brand defendants for injuries of consumers of the generic competing product. Darvocet, 756 F.3d at 947-48, 2014 WL 2959271, at *27-28.
Huck points to no provision of the Products Restatement that would eliminate Mulcahy’s product-identification causation requirement or that would impose liability on a defendant whose product the plaintiff never used. We adopted sections 1 and 2 of the Products Restatement in Brooke Group Ltd,., 652 N.W.2d at 169. Those provisions require proof the defendant’s product injured the plaintiff. Section 1 provides, “One ... who sells or distributes a defective product is subject to liability for harm to persons or property caused by the defect.” Restatement (Third) of Torts: Prods. Liab. § 1, at 5. Section 2 defines defect to include inadequate warnings or instructions.[14] Id. § 2, at 14. Section 6 specifically addresses prescription drugs and imposes “liability for harm to persons caused by the defect.” Id. § 6(a), at 144. Section 15 provides, “Whether a product defect caused harm to persons or property is determined by the prevailing rules and principles governing causation in tort.” Id. § 15, at 231. The prevailing rule requires cause-in-fact causation. See Restatement (Third) of Torts: Liab. for Physical Harm § 26, at 346 (“Conduct is a factual cause of harm when the harm would not have occurred absent the conduct”). Cause-in-fact is lacking when the plaintiff used only a competitor’s product, not the defendant’s. See Mulcahy, 386 N.W.2d at 76. As noted above, the overwhelming majority of courts apply this product-identification causation requirement in Reglan litigation to reject claims against brand defendants for injuries caused by use of a competitor’s generic drug.
We are not persuaded by the two outlier appellate decisions cited by Huck: Wyeth, Inc. v. Weeks, — So.3d— ,— , 2013 WL 135753, at *19, reargument granted (June 13, 2013) (Ala.Jan.11, 2013) (applying Alabama law); Conte v. Wyeth, Inc., 168 Cal.App.4th 89, 85 Cal.Rptr.3d 299, 304-05 (2008) (applying California law).[15] Both concluded the product-identification causa-
*375 tion requirement for strict liability claims did not apply to fraud and negligent misrepresentation theories under the applicable state law. Weeks, — So.3d at-, 2013 WL 135753, at *19; Conte, 85 Cal. Rptr.3d at 317-18. Iowa law differs. As we held in Mulcahy, a plaintiff seeking recovery for the side effects of a prescription who sues a pharmaceutical company under any theory, including misrepresentation, must prove she was injured by using the prescription drug manufactured or supplied by that defendant. 386 N.W.2d at 69, 72-73, 76. Additionally, the Alabama Supreme Court subsequently granted Wyeth’s application for rehearing and reset Weeks for a second oral argument heard in September 2013. Lorelei Laird, Generic drugs leave a bad taste for patients filing tort suits, ABA Journal (Feb. 1, 2014), http://www.abajournal.com/ magazine/article/generic_drugsUeave_a_ bad_taste_for_patientsJBling_tort_suits/. Judge Murdock, in his well-reasoned dissent from the initial decision, observed:
[Ajlmost every one of the 47 reported cases decided before the United States Supreme Court’s decision in [Mensing], including cases decided by two United States Circuit Courts of Appeals, hold that a manufacturer of a brand-name drug has no duty to the consumer of a generic drug manufactured and sold by another company. (Only three courts, including the court certifying the question in this ease, have held otherwise.) Since the Supreme Court’s 2011 decision in PLIVA, every one of the 11 cases that have addressed the issue, including decisions by three United States Circuit Courts of Appeals, has reached this same conclusion.
As these numbers indicate, the Supreme Court’s holding in [Mensing]— that state-law claims against generic-drag manufacturers are preempted by the federal regulatory scheme — did nothing to undermine the essential rationale in the plethora of pre- and post-[.Mensing] decisions holding that brand-name manufacturers are not liable for injuries caused by deficient labeling of generic drugs they neither manufactured nor sold. In fact, as discussed below, the opinion in [Mensing] expressly says as much, and opinions in post-[Mensing] cases are even more explicit in saying so.
Weeks, — So.3d at-, 2013 WL 135753, at *21 (Murdock, J., dissenting). It remains to be seen how the Alabama Supreme Court will ultimately decide whether brand defendants may be held liable under Alabama law to consumers who used only the generic formulation sold by a competitor.
Not only is Huck unable to satisfy Mul-cahy’s causation requirement, she cannot establish that the brand defendants owed her a duty. Cf Hoyt v. Gutterz Bowl & Lounge L.L.C., 829 N.W.2d 772, 775 (Iowa 2013) (“[T]he determination of whether a duty is owed under particular circumstances is a matter of law for the court’s determination.”). We have made clear that our adoption of section 7 of the Restatement (Third) of Torts in Thompson did not supersede our precedent limiting liability based on the relationships between the parties. McCormick v. Nikkei & As-socs., 819 N.W.2d 368, 374 (Iowa 2012) (noting general duty of care under section 7(a) is “subject to ‘an articulated countervailing principle or policy’ ” in section 7(b), which “ ‘may be reflected in longstanding [sic] precedent’ ” (quoting Restatement (Third) of Torts: Liab. for Physical Harm § 7(b) & cmt. a, at 77-78)). In McCormick, we discussed how the law of duty remains intact in important ways after Thompson:
Historically, the duty determination focused on three factors: the relation *376 ship between the parties, the foreseeability of harm, and public policy. [Thompson, 774 N.W.2d] at 834. In Thompson, we said that foreseeability should not enter into the duty calculus but should be considered only in determining whether the defendant was negligent. Id. at 835. But we did not erase the remaining law of duty; rather, we reaffirmed it. Id. at 834-36. In short, a lack of duty may be found if either the relationship between the parties or public [policy] considerations warrants such a conclusion.
McCormick, 819 N.W.2d at 371. We reiterated “our previous law of duty was otherwise still alive and well.” Id. We affirmed summary judgment for the defendant electrical subcontractor under the control rule that predated Thompson. McCormick, 819 N.W.2d at 375; see also Feld v. Borkowski, 790 N.W.2d 72, 76-77 & n. 1 (Iowa 2010) (applying contact-sports rule that predated Thompson to tort claim arising from injury to player during high school intramural softball game because the Restatement (Third) of Torts “expresses the notion that a reasonable-care duty applies in each case unless a special duty, like the contact-sports exception, is specifically recognized” (citing Restatement (Third) of Torts: Liab. for Physical Harm § 7 cmt. a, at 77)).
Due to the unique nature of the relationship between generic and brand manufacturers, a “ ‘countervailing principle or policy warrants denying liability in [this] particular class of cases.’ ” Thompson, 774 N.W.2d at 835 (quoting Restatement (Third) of Torts: Liab. for Physical Harm § 7(b), at 90) (Proposed Final Draft No. 1, 2005); accord Kelly v. Wyeth, No. Civ. A.MICV200303314B, 2005 WL 4056740, at *4 (Mass.Super. May 6, 2005) (concluding “strong social policy reasons” weigh against finding brand manufacturers owe a duty to generic consumers). As we concluded in Mulcahy, to expand tort liability to those who did not make or supply the injury-causing product used by the plaintiff involves policy choices and “social engineering more appropriately within the legislative domain.” 386 N.W.2d at 76. Congress has created a symbiotic relationship between brand and generic drug manufacturers. In this relationship,
[n]ame brand manufacturers undertake the expense of developing pioneer drugs, performing the studies necessary to obtain premarketing approval, and formulating labeling information. Generic manufacturers avoid these expenses by duplicating successful pioneer drugs and their labels. Name brand advertising benefits generic competitors because generics are generally sold as substitutes for name brand drugs, so the more a name brand drug is prescribed, the more potential sales exist for its generic equivalents.
Foster, 29 F.3d at 170. The Foster court recognized that, as between these competing pharmaceutical companies, it would be “especially unfair” to find brand manufacturers have a duty to those who take generic drugs “when, as here, the generic manufacturer reaps the benefits of the name brand manufacturer’s statements by copying its labels and riding on the coattails of its advertising.” Id.; see also Kelly, 2005 WL 4056740, at *4 (highlighting that “[the drug] approval process can be a very time consuming and costly endeavor [for brand manufacturers], as the manufacturer bears the cost of research and development, as well as performing clinical studies of the drug’s safety and effectiveness” while “[t]he makers of generic drugs, by contrast, do not have to expend the same amount of resources”).
*377 Through carefully crafted legislation, Congress has made policy choices that impact the economics of prescription drug sales to increase access to medication. Huck cites nothing in the text of the Hatch-Waxman Amendments or congressional record suggesting Congress intended to render brand defendants liable to consumers of generic products. To impose such liability would alter the relationship between generic and brand manufacturers. Specifically, extending liability to brand manufacturers for harm caused by generic competitors would discourage investments necessary to develop new, beneficial drugs by increasing the downside risks. See Schwartz, 81 Fordham L.Rev. at 1870-72 (elaborating reasons why “expanding liability for a competitor’s product is not sound health policy”).
Economic and public policy analyses strongly disfavor imposing tort liability on brand manufacturers for harm caused by generic competitors. See generally Richard A. Epstein, What Tort Theory Tells Us About Federal Preemption: The Tragic Saga of Wyeth v. Levine, 65 N.Y.U. Ann. Surv. Am. L. 485 (2010) [hereinafter Epstein]. As Professor Epstein observed:
The powerful influence of common law decisions creates gratuitous expense and uncertainty that feed their way back into the cycle of drug development, testing, and marketing. Properly understood, the entire duty-to-warn apparatus has become a tax on drugs, which; in some instances, may drive both old and new products off the market and, in most instances, will increase drug cost and reduce the levels of beneficial patient use.
Id. at 514. Professor Epstein further noted:
The judicial failure to understand the historical arc of the law of torts leads to a second set of unsound judgments on matters of institutional competence.... There is nothing that erratic and expensive juries can do to make accurate scientific judgments that will allow people to plan their conduct in advance. Stability of expectations is indispensable in marketing dangerous compounds, and, for all its manifest failings, the FDA is better at this task than juries.
Id. at 522. As Professor Epstein elaborated:
The FDA, for all its flaws, does have one advantage over a system of tort liability: It makes its judgments on the overall effects of drug use, not on the particulars of individual cases where the question of proper warning is compromised in a number of ways.
Id. at 488 (footnote omitted).[16]
Huck fails to articulate any persuasive case that public health and safety would be advanced through imposing tort liability on brand defendants for injuries caused by generic products sold by competitors. We agree with Professor Epstein that courts are not institutionally qualified to balance the complex, interrelated, and divergent policy considerations in determining labeling and liability obligations of brand and generic pharmaceuticals. Courts deal ad hoc with the record made by private litigants. By contrast, the FDA, with its four billion dollar budget, engages in public rulemaking allowing transparent input from all interest groups, guided by its own staff of qualified scientists.
*378 Fundamental tort principles of risk apportionment further support a no-duty bolding; in this case. Liability generally follows control in our tort law. Cf. McCormick, 819 N.W.2d at 374 (noting the party in control “is best positioned to take precautions to identify risks and take measures to improve safety”). But, the brand defendants “d[id] not place [the generic product] in commerce, ha[d] no ability to control the quality of the product or the conformance of the product with its design, and d[id] not have the opportunity to treat the risk of producing the product as a cost of production against which liability insurance can be obtained.” See Am. L. Prod. Liab.Bd § 5:10 (noting that, under these circumstances, “the defendant has not undertaken and assumed [a] special responsibility toward the consuming public”). Accordingly, the brand defendants cannot be classified as the sellers of the generic me-toclopramide Huck ingested. See Restatement (Third) of Torts: Prods. Liab. § 1, at 5.
A brand manufacturer cannot ensure that a generic manufacturer complies with federal law — the two are, after all, competitors. The brand defendants had no control over whether PLIVA used their improved warning language approved by the FDA in 2004. Indeed, in this case PLIVA failed to update its label to conform to the improved warnings by the brand defendants approved by the FDA in 2004. Huck will have her day in court against PLIVA. We adopted products liability to place responsibility for the harm caused by a product on the party who profits from its manufacture and sale. See Brooke Grp. Ltd., 652 N.W.2d at 164 (noting our purpose in adopting principles of products liability was to ensure “‘that the costs of injuries resulting from defective products are borne by the manufacturers that put such products on the market’ ”) (quoting Hawkeye-Sec. Ins. Co. v. Ford Motor Co., 174 N.W.2d 672, 683 (Iowa 1970)). PLI-VA, not the brand defendants, profited from its sale of the generic formulation that harmed Huck.
We reject Huck’s argument based on Bredberg v. PepsiCo, Inc., 551 N.W.2d 321 (Iowa 1996). Huck relies on Bredberg to argue Iowa law permits liability on a party who designs, but does not manufacture or sell, the product that injured the plaintiff. In Bredberg, plaintiff was injured by an exploding glass bottle of Diet Mountain Dew. Id. at 323. He sued the retailer, PepsiCo, Inc. (which made and sold the Diet Mountain Dew concentrate), as well as Pepsi Cola General Bottlers, Inc. (which bottled and distributed the soft drink under a license agreement). Id. at 323 & n. 1. The bottler was “required to mix the concentrate pursuant to a formula provided by PepsiCo.” Id. at 323 n. 1. The defendants moved for a directed verdict on grounds the evidence was insufficient to prove the bottle was defective. Id. at 324. Importantly for present purposes, PepsiCo did not move for a directed verdict on grounds it did not manufacture or sell the bottle. The jury returned a verdict for plaintiff and allocated fault fifty percent to plaintiff, five percent to the retailer, twenty-five percent to the bottler, and twenty percent to PepsiCo. Id. at 325. The district court entered judgment for half the damages, and PepsiCo and the bottler appealed. Id. at 325. We transferred the case to the court of appeals, which reversed. Id. We granted Bredberg’s application for further review. Id. at 326. In a footnote, we stated “PepsiCo contends that its licensing agreement with [the bottler] Pepsi Cola is not sufficient to impute liability on it as a manufacturer.” Id. at 326 n. 4. We declined to follow a case based on a Georgia statute because it “says nothing about whether PepsiCo could be held liable as a product ‘designer,’ as alleged by plain *379 tiff against PepsiCo in the present case.” Id. We went on to review the evidence and conclude it was sufficient to support the verdict that the bottle was defective. Id. at 326-29. We held the district court correctly denied defendants’ posttrial motions and affirmed the judgment for plaintiff on that basis. Id. at 329.
The fighting issue in Bredberg was whether there was substantial evidence the bottle that exploded was defective. See id. at 327-28. That was the basis of the rulings on the directed verdict motion and the motion for JNOV, rulings our holding affirmed. Id. at 324-25. PepsiCo supplied the concentrate and, therefore, was a component parts supplier of the completed product — the full bottle of carbonated soft drink. See id. at 323 n. 1. PepsiCo essentially outsourced the manufacture of the glass bottle and distribution of the finished product to its licensee, the bottler. Pepsi-Co controlled part of the manufacturing (mixing) process for the very product that injured plaintiff. See id. PepsiCo was thus in the chain of distribution of the injury-causing product, with significant control over the process for which it profited. PepsiCo was held liable for injuries caused by the Pepsi product, consistent with Mulcahy — not for injuries from an exploding Coca-Cola bottle sold by a competitor.[17]
By contrast, the brand defendants control the brand label, but do not otherwise control PLIVA. As we noted, PLIVA failed to adopt the new warning language used by the brand defendants in 2004. And, the brand defendants, who incurred the costs to develop Reglan, do not profit from PLIVA’s sale of the competing generic formulation.
Judge Murdock observed that limiting liability to the defendant that made the drug used by the plaintiff is consistent with “bedrock principles of tort law and of economic realities underlying those principles”:
From the beginning, what Alexander Hamilton referred to as “[t]he spirit of enterprise, which characterizes the commercial part of America,” has animated Americans to work hard to produce innovative goods and services that have benefited not only themselves, but also their children, their communities, and America as a whole. An enterprising spirit alone, however, is not enough. The law must protect the fruits of enterprise and create a climate in which trade and business innovation can flourish. Concomitantly, the law must justly allocate risks that are a function of that free trade and innovation.
*380 These dual needs have resulted in an economic and legal system that always has coupled the rewards from the sale of a good or service with the costs of tor-tious injury resulting from the same. Indeed, this and the corollary notion that parties are responsible for their own products, not those of others, are so organic to western economic and legal thought that they rarely find need of expression.
Weeks,-So.3d at-, 2013 WL 135753, at *20 (Murdock, J., dissenting) (alteration in original) (footnote omitted).
We adhere to these bedrock principles today and join the multitude of courts that have concluded brand defendants owe no duty to consumers of generic drugs. See, e.g., Darvocet, 756 F.3d at 938 - 39, 2014 WL 2959271, at *17-18 (affirming dismissals of claims against brand defendants on no-duty grounds); Lashley, 750 F.3d at 476 (“[B]ecause Appellants did not ingest the brand manufacturers’ products, these defendants have no common-law duty to them.”); Strayhom, 737 F.3d at 405 (acknowledging that “ ‘[although a product manufacturer generally has a duty to warn of the dangers of its own products, it does not have a duty to warn of the dangers of another manufacturer’s products’ ” (quoting Barnes v. Kerr Corp., 418 F.3d 583, 590 (6th Cir.2005))); Schrock, 727 F.3d at 1282 (recognizing “[w]hether or not a duty exists depends on the relationship between the parties” and “brand-name manufacturers do not have any relationship” with the plaintiff who ingested a generic drug (alteration in original) (internal quotation marks omitted)); Bell, 716 F.3d at 1093 (“[N]othing in Arkansas law ... supports extending such a duty of care to the customer of a competitor using a competing product.”); Foster, 29 F.3d at 171 (concluding “Wyeth has no duty to the users of other manufacturers’ products”).
We are unwilling to make brand manufacturers the de facto insurers for competing generic manufacturers. Cf. Schwartz, 81 Fordham L.Rev. at 1871 (“Deep-pocket jurisprudence is law without principle.”) It may well be foreseeable that competitors will mimic a product design or label. But, we decline Huck’s invitation to step onto the slippery slope of imposing a form of innovator liability on manufacturers for harm caused by a competitor’s product. Where would such liability stop? If a car seat manufacturer recognized as the industry leader designed a popular car seat, could it be sued for injuries sustained by a consumer using a competitor’s seat that copied the design? Why not, under Huck’s theory, if it is foreseeable others will copy the design?
In sum, we will not contort Iowa’s tort law in order to create liability for brand manufacturers. The unfairness resulting from Mensing is best addressed by Congress or the FDA. See Mensing, 564 U.S. at-, 131 S.Ct. at 2582, 180 L.Ed.2d at 597 (“As always, Congress and the FDA retain the authority to change the law and regulations if they so desire.”); Schwartz, 81 Fordham L.Rev. at 1875 (“Congress and the FDA ... are the appropriate arms of government for making [drug liability] decisions in the context of fashioning the best health care policy for the country.”); see generally Daniel Kazhdan, Wyeth and PLIVA: The Law of Inadequate Drug Labeling, 27 Berkeley Tech. L.J. 893 (2012) (discussing Levine and Mensing and “proposing] ways that drug companies, the FDA, Congress, and the states could remedy the harmful effects of the Court’s distinction between brand-name drugs and generic drugs”). Indeed, the FDA’s proposed rule allows generic manufacturers to unilaterally strengthen their labels. See *381 generally Proposed Rule, 78 Fed.Reg. 67985-02. This rule would abrogate the Mensing holding, permitting consumers of generic drugs to bring a claim against generic manufacturers consistent with the Levine analysis.
We will continue to apply the same long-standing causation rule applied in Mulcahy, which required Huck to prove the defendant manufactured or supplied the product that caused her injury, and we decline to extend the duty of product manufacturers to those injured by use of a competitor’s product. We will not impose liability on the brand defendants for injuries to those using only the competing generic formulation. The district court correctly concluded the brand defendants were entitled to summary judgment in their favor.
IV. Disposition.
For the foregoing reasons, we vacate the decision of the court of appeals, reverse in part the district court’s summary judgment for PLIVA and remand for further proceedings on Huck’s claims against PLI-VA based on its failure to adopt the 2004 warning language approved by the FDA for Reglan. We affirm the district court’s summary judgments dismissing the other claims against PLIVA and dismissing Huck’s claims against the brand defendants.
DECISION OF COURT OF APPEALS VACATED; DISTRICT COURT JUDGMENTS AFFIRMED IN PART, REVERSED IN PART, AND REMANDED WITH INSTRUCTIONS.
All justices concur except CADY, C.J., who concurs specially, and HECHT, WIGGINS, and APPEL, JJ., who concur in part and dissent in part.

. A.H. Robinson Company, Inc. obtained the original FDA approval for Reglan. Wyeth is the successor in interest to A.H. Robinson.

. Schwarz then manufactured and distributed Reglan until February 2008, when the brand was again sold.

. Huck's petition also named as defendants two of her physicians, Trimark Physicians Group, and Barr Laboratories (PLIVA's parent company). The district court granted summary judgment in favor of Barr Laboratories after Huck failed to serve the company with original notice. Huck’s physicians and Trimark Physicians Group were later granted summary judgment based on Huck's failure to timely file expert designations. Huck did not appeal the summary judgments for those parties.

. The learned intermediary doctrine is not at issue in this appeal.

.The district court dismissed the following claims: strict liability for failure to warn, strict liability for design defect, design defect, strict liability for manufacturing defect, breach of express warranty, breach of implied warranty (excluding breach of implied warranty of merchantability), fraud (to the extent they are not based on nondisclosure), breach of undertaking a special duty, the Unfair Trade Practice Act, intentional infliction of emotional distress. Huck does not appeal the dismissal of those claims.

. PLIVA argues Huck preserved error only as to her failure-to-warn and breach-of-implied-warranty claims. When PLIVA moved for summary judgment in the wake of Mensing, Huck resisted this motion and argued her claims were still viable. On January 5, 2012, the district court dismissed all of Huck’s remaining claims as preempted by Mensing. In her motion for reconsideration, Huck mentioned only her failure-to-warn claims and breach-of-implied-warranty claims. Nevertheless, we consider error preserved as to the additional claims because Huck resisted summary judgment and argues those claims on appeal.

. PLIVA argues that Huck cannot base her failure-to-wam claim on the 2004 label update because she has asserted the label was inadequate even with the additional language. The court of appeals agreed, concluding, "Iowa law does not provide a cause of action for failing to disseminate allegedly inadequate warnings.” This mischaracterizes the issue. This argument — that "títere is no such thing as a 'failure to inadequately warn' " — was rejected by the Sixth Circuit. Fulgenzi, 711 F.3d at 587-88. As that court observed:
It may well be more difficult to prove proximate causation in a case where the warning that the defendant failed to provide was also legally inadequate. But there is no reason to believe that a severely inadequate warning would never cause an injury that a moderately inadequate warning would have prevented. A plaintiff need not prove that the alternative warning would have been objectively reasonable, only that it would most likely have prevented the injury in this case.
. .. [I]t is sufficiently plausible that the use of a neutral warning disavowing approval instead of a bold-faced warning affirmatively discouraging long-term use proximately caused [plaintiff’s] injury. Whether in fact these allegations are true is a matter for further proceedings.
Id. We agree with the Fulgenzi court’s reasoning.
The court of appeals also stated, "Huck has not argued these [2004 updated] warnings— providing what she argued is faulty information — would have prevented the harm she suffered." We do not find Huck has conceded that issue. To the contrary, Huck successfully resisted PLIVA’s motion for summary judgment, in which PLIVA argued Huck was unable to prove that if she or her physician "had received an adequate warning, she would not have ingested the drug." The district court denied PLIVA's motion, finding that based on the record provided fact issues precluded summary judgment. Cf. Clinkscales v. Nelson Sec., Inc., 697 N.W.2d 836, 841 (Iowa 2005) (”[W]e reiterate the well-settled maxim that questions of negligence or proximate cause are ordinarily for the jury — only in exceptional cases should they be decided as a matter of law.”); Lovick v. Wil-Rich, 588 N.W.2d 688, 700 (Iowa 1999) (affirming denial of directed verdict on failure-to-warn claim; noting "proximate cause can be established by showing a warning would have altered the plaintiff's conduct so as to avoid injury”); see also Restatement (Third) of Torts: Prods. Liab. § 2 cmt. i, illus. 11, at 31 (1998) ("Whether the warning actually given was reasonable in *364 the circumstances is to be decided by the trier of fact.”); cf. In re Prempro Prods. Liab. Litig., 586 F.3d 547, 569 (8th Cir.2009) (" ‘[[T]]he vast majority of jurisdictions hold that where a warning is inadequate, the plaintiff is entitled to a rebuttable presumption that an adequate warning would have been heeded if one had been given.’ " (quoting Thom v. Bristol-Myers Squibb Co., 353 F.3d 848, 855 (10th Cir.2003))). We decide today only the preemption issue as to Huck’s claims against PLIVA and leave for further proceedings issues concerning the adequacy of PLIVA's warnings and whether an updated warning in 2004 would have reached Huck or her physicians and altered her behavior.

. These courts include: Neeley v. Wolters Kluwer Health, Inc., No. 4:11-CV-325 JAR, 2013 WL 3929059, at *9 (E.D.Mo. July 29, 2013); Phelps v. Wyeth, Inc., 938 F.Supp.2d 1055, 1061 (D.Or.2013); Johnson v. Teva Pharm. USA, Inc., No. 2:10 CV 404, 2012 WL 1866839, at *3 (W.D.La. May 21, 2012); Cooper v. Wyeth, Inc., No. 09-929-JJB, 2012 WL 733846, at *4 (M.D.La. Mar. 6, 2012); Lyman v. Pfizer, Inc., No. 2:09-cv-262, 2012 WL 368675, at *5-6 (D.Vt. Feb. 3, 2012); Couick v. Wyeth, Inc., No. 3:09-cv-210-RJC-DSC, 2012 WL 79670, at *5 (W.D.N.C. Jan. 11, 2012); Del Valle v. PLIVA, Inc., No. B:11-113, 2011 WL 7168620, at *5 (S.D.Tex. Dec. 21, 2011); Fisher, 817 F.Supp.2d at 805; In re Reglan Litig., No. 289, 2012 WL 1613329 (N.J.Super.Ct. Law Div. May 4, 2012); Has *365 sett v. Dafoe, 74 A.3d 202, 216 (Pa.Super.Ct.2013); see also Teva Pharm. USA, Inc. v. Super. Ct., 217 Cal.App.4th 96, 158 Cal. Rptr.3d 150, 158 (2013) (relying on Fulgenzi to hold failure-to-warn claim not preempted when generic manufacturers of alendronate sodium did not mirror the branded Fosamax label). In contrast, the Court of Appeals for the Fourth Circuit recently affirmed a summary judgment dismissing all claims against PLIVA based on Mensing's impossibility or conflict preemption, while expressly noting the 2004 update theory was not timely made in that case. Drager v. PLIVA USA, Inc., 741 F.3d 470, 474-76 (4th Cir.2014).

. Because defendants in Mensing argued only that it was impossible for a generic manufacturer to unilaterally strengthen its label without running afoul of federal law, the Mensing opinion did not consider the purposes and objectives prong of the conflict preemption analysis. 564 U.S. at -, 131 S.Ct. at 2587, 180 L.Ed.2d at 602-03 (Sotomayor, J., dissenting).

. This is distinct from the duty of label sameness imposed by federal law. If Huck premised her claim upon the duty of sameness, it would be preempted as an attempt to enforce federal law. See Fulgenzi, 711 F.3d at 588-89. Yet, we do not expect Huck to try her case without reference to the fact that the FDA approved a warning against prolonged use in 2004. We agree with the Fulgenzi court:
Although federal-law violations here are not as relevant as they would be in a negligence per se case, references to federal law will inevitably arise. To avoid Mensing preemption, [plaintiff] must use the language of the 2004 FDA-approved label in her proximate-cause argument, not (or not merely) the fact of the failure to update. Federal standards are also likely to arise in determining the adequacy of PLIVA’s warning, since FDA approval and industry practices may be relevant to the state duty of care.

Id.

. In contrast, "[fjailure to update from one adequate warning to another would violate the FDCA, but not [state] law.” Fulgenzi, 711 F.3d at 586-87.

. Our preservation-of-error rules permit us to review issues the district court actually decided when granting an unresisted motion for summary judgment. Otterberg, 696 N.W.2d at 27-28. The brand defendants agree error is preserved to review whether the district court correctly entered summary judgment in their favor based on Mulcahy. Huck gave the district court the opportunity to revisit the issue in light of Mensing when she filed her motion for relief from judgment. See Ganzer, 686 N.W.2d at 197-98 (requiring postjudgment motion to preserve error for appellate review of unresisted summary judgment). Accordingly, we conclude error is preserved.

. Section 7 provides:
(a) An actor ordinarily has a duty to exercise reasonable care when the actor's conduct creates a risk of physical harm.
(b) In exceptional cases, when an articulated countervailing principle or policy warrants denying or limiting liability in a particular class of cases, a court may decide that the defendant has no duty or that the ordinary duty of reasonable care requires modification.

. Section 2(c) states:
[A product] is defective because of inadequate instructions or warnings when the foreseeable risks of harm posed by the product could have been reduced or avoided by the provision of reasonable instructions or warnings by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the instructions or warnings renders the product not reasonably safe.
Restatement (Third) of Torts: Prods. Liab. § 2(c), at 14.

. Huck cites several unpublished trial court decisions allowing claims to proceed against brand defendants when plaintiffs used only the generic formulation, and one published district court decision, Kellogg v. Wyeth, 762 F.Supp.2d 694 (D.Vt.2010). Kellogg applied Vermont law that, unlike Iowa's, permits recovery for harm inflicted by a competitor's product. See 762 F.Supp.2d at 708-09. Kellogg is at odds with Mulcahy. The unpublished decisions cited by Huck are similarly at odds with Mulcahy and lack precedential value. A more recent Court of Appeals for the Seventh Circuit case. In re GlaxoSmithKline LLC, 557 Fed.Appx. 578, 578-79 (7th Cir. 2014), provided by Huck subsequent to oral argument is also unpersuasive. Though the plaintiff in that case ingested only a generic medication, the district court denied the brand manufacturer's motion for summary judgment. Id. The brand manufacturer petitioned the Seventh Circuit for a writ of mandamus to correct that ruling. Id. The Seventh Circuit acknowledged “that a majority of federal courts has ruled in favor of the [brand] manufacturer,” but denied the brand manufacturer’s petition for a writ of mandamus, reasoning that the legal issue could be resolved on appeal from a final judgment. Id.

. Epstein favors preemption of state law failure-to-warn claims against brand defendants brought by consumers of Reglan, Epstein, 65 N.Y.U. Ann.Surv. Am. L. 485, a view rejected in Levine. See Levine, 555 U.S. at 581, 129 S.Ct. at 1204, 173 L.Ed.2d at 70. Yet, his policy arguments apply with greater force to efforts to extend state tort liability to brand defendants for injuries to consumers who used only the competing generic drug.

. Huck does not attempt to support her innovator liability theory against the brand defendants by relying on our court’s professional malpractice decisions in which defective plans or specifications caused harm. See, e.g., Schiltz v. Cullen-Schiltz & Assocs., Inc., 228 N.W.2d 10, 12 (Iowa 1975). In Schiltz, a professional engineering firm was paid to design plans for the construction of a sewage treatment plant. Id. at 12. The general contractor built the facility in accordance with the engineer’s design, which failed to provide for a dike for flood protection. Id. at 12-13. A nearby creek flooded and damaged the facility. Id. at 13. The contractor sued the engineering firm for negligently designing the facility without adequate flood protection, and the jury ultimately found for the plaintiff-contractor. Id. at 12-13. We affirmed the submission of the negligence theory. Id. at 18. Schiltz does not support imposing liability on brand defendants. The defendant engineer was hired and paid to design the facility built by the plaintiff. The engineer provided a service, not a product. Schiltz is not a case in which a different engineer copied and sold the design made by defendant for another project. There was no attempt in Schiltz to impose liability on a remote designer who was not retained and paid for the construction project at issue.