Wilson, Paul D., J.
Plaintiffs, students at Harvard University, bring this lawsuit to challenge the manner in which the University is investing its considerable endowment. Harvard, however, says that the real issue here concerns not where Harvard should invest, but rather which members of the Harvard community should make its investment decisions. The Attorney General of the Commonwealth of Massachusetts, also a Defendant, asserts that this case is really about who has the power to challenge a charitable organization’s decisions about the investment of its funds.
Both Harvard and the Attorney General have moved to dismiss the students’ lawsuit. After reviewing the Complaint and the extensive written materials submitted by the parties, and hearing oral argument, I will allow both motions to dismiss, because standing to bring a lawsuit “is not measured by the intensity of the litigant’s interest or the fervor of his advocacy.” Enos v. Sec’y of Envtl. Affairs, 432 Mass. 132, 135 (2000) (internal citations omitted).
Background
Plaintiffs are seven undergraduate, graduate and law students at Harvard University, along with an unincorporated association to which they and other students belong. Also named as a plaintiff is “Future Generations.”[3] Plaintiffs believe that the use of fossil fuels is contributing to the problem of climate change, which they see as the most serious current threat to their own well-being, to future generations, and to the planet itself. Therefore Plaintiffs want Harvard to divest itself of investments in fossil fuel companies.
To that end, Plaintiffs brought this lawsuit, seeking a permanent injunction requiring that Harvard immediately sell off its direct holdings in fossil fuel companies, and begin divesting itself of its indirect holdings in those companies. Plaintiffs have named as Defendants the University (under its formal name, President and Fellows of Harvard College) and Harvard Management Company, which manages the University’s endowment.[4] Because this lawsuit concerns investment decisions of a charitable corporation, an area regulated by the Attorney General, Plaintiffs have joined the Attorney General as a defendant, as required by G.L.c. 12, §8G.
In deciding these motions to dismiss, I must deem all allegations in the Complaint to be true, Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), and I must consider those allegations generously and in Plaintiffs’ favor. Vranos v. Skinner, 77 Mass.App.Ct. 280, 287 (2010). Those allegations, in brief, are as follows.
The Complaint first alleges, in detail and at length, that the burning of fossil fuels results in the emission of greenhouse gases that is causing physical changes to the Earth’s ecosystems, resulting in deleterious *530 geopolitical, economic and social consequences. The Complaint further alleges that Harvard directly owns stocks in publicly traded fossil fuel companies worth at least $79 million, and indirectly owns additional shares in such companies.
The Complaint notes that the Charter of the Harvard Corporation imposes obligations on the University’s President and Fellows to, among other things, advance the education of youth, and promote “the advancement of all good literature, arts, and sciences in Harvard College.” Investment in fossil fuel companies, according to the Complaint, is at odds with these obligations, and harms Plaintiffs because that investment directly supports climate change denial by fossil fuel companies, which interferes with Plaintiffs’ attempts to educate other students on the facts of climate change and to promote a safe transition to a healthy and secure energy future. Those fossil fuel investments also have a chilling effect on academic freedom, among other things by impeding Plaintiffs’ ability to associate with like-minded colleagues and to avail themselves of the open scholarly environment that Harvard has a duty to maintain. Plaintiffs also allege “diminishment” of their educations because fossil fuel companies’ promotion of scientific falsehoods, funded by Harvard, impedes Plaintiffs in preparing for their intended careers, in, among other areas, environmental law, renewable energy science, and organic farming.
The Complaint also notes that the Charter obligates the University’s President and Fellows to maintain the University’s physical campus. Harvard’s investment in fossil fuel companies is at odds with that obligation, because even under optimistic scenarios, the Complaint alleges, parts of the Harvard campus near the Charles River will be flooded every two to three years by 2050 as a result of climate change.
The Complaint points out that Harvard has divested from companies whose activities ran counter to the University’s educational mission in the past. The Complaint alleges that a broad array of Harvard alumni and faculty, as well as political leaders and scientists, have called upon the University to sell its investments in fossil fuel companies.
From these allegations, Plaintiffs construct a two-count complaint. First, Plaintiffs accuse Harvard of mismanagement of charitable funds. Second, Plaintiffs assert the right of “Future Generations” to be free of what the Plaintiffs call “Intentional Investment in Abnormally Dangerous Activities.”
ANALYSIS
In deciding these motions to dismiss, I must accept as true “all facts pleaded by the nonmoving party,” Jarosz v. Palmer, 436 Mass. 526, 529 (2002) (citation omitted), in this case Plaintiffs. I also must accept as true “such inferences as may be drawn [from those facts] in the [nonmoving parly’s] favor.” Blank v. Chelmsford Ob/Gyn, P.C., 420 Mass. 404, 407 (1995). This deference to the nonmoving party’s statement of the claim is not unbounded, however, because I must “look beyond the conclusoiy allegations in the complaint,” Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 675 (2011), and determine if the nonmoving parly has pled “factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief,” which “must be enough to raise a right to relief above the speculative level.” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007).
1. Standing to Sue Over Mismanagement of Charitable Funds
Count I of the Complaint charges Harvard with mismanagement of its endowment, which consists of funds given in trust to the University to further its charitable purposes, including the purposes set out in the Charter of the Harvard Corporation quoted above. Both Harvard and the Attorney General argue that Plaintiffs have no standing to maintain this claim.
Plaintiffs concede, as they must, that, under G.L.c. 12, §8, “Authoriiy to enforce the due application of charitable funds in Massachusetts normally rests with the Attorney General.” Plaintiffs’ Memorandum in Opposition to Defendant Martha M. Coakley’s Motion to Dismiss (“Opp. to Attorney General’s Motion”) at 5. In fact, the Supreme Judicial Court has often stated that the Attorney General has exclusive jurisdiction in this area. See, e.g., Weaver v. Wood, 425 Mass. 270, 275 (1997). However, as Plaintiffs point out, the Supreme Judicial Court has also created a small chink in the armor of Attorney General exclusivity, through which private citizens can also assert claims that a public charily is mismanaging its assets — "but only where the plaintiff asserts interests in such organizations which are distinct from those of the general public." Id. at 276.
Plaintiffs in today’s case claim that they are entitled to standing because they hold such “personal rights” distinct from those of the general public. Plaintiffs refer to two types of “personal rights.”
Their first basis for standing, Plaintiffs say, is their status as Harvard students who “currently and actually enjoy the benefits of Harvard’s charitable activity.” Opp. to Attorney General’s Motion at 10; see, e.g., Complaint ¶¶50(0), 51. Because they are students, Plaintiffs suggest, they have standing to enforce the terms of the Charter of Harvard College requiring Harvard to engage in “the advancement of education of youth” and the maintenance of the University’s physical campus, id., ¶49, and the “advancement of all good literature, arts, and sciences in Harvard College.” Id., ¶50.
Second, Plaintiffs point to “the crucial, additional [to student status] factor that builds upon this [student] status: namely, the exceptional harms caused by investment in fossil fuels.” Opp. to Attorney General’s Motion at 12. The Complaint alleges that *531 Plaintiffs are suffering these exceptional harms personally, as a result of Harvard’s investment in fossil fuel companies. See Complaint ¶¶54-55, 57-62.
A. Standing Based on Status as Harvard Students
The Supreme Judicial Court has permitted persons other than the Attorney General to sue over mismanagement of charitable assets only on rare occasions. One recent case in which the court found such standing, discussed by all parties, provides a logical starting point for the analysis of Plaintiffs’ claimed standing.
Maffei v. Roman Catholic Archbishop of Boston, 449 Mass. 235 (2007), arose from the defendant Catholic Archbishop’s decision to close a church in Wellesley. The lawsuit was filed by members of the family that had provided the land on which the church was built, who claimed that the closing of the church triggered an equitable reversionary interest in that land in their favor. Another plaintiff was a parishioner who was seeking the return of her substantial financial contributions to the parish, on a theory of negligent misrepresentation. The Supreme Judicial Court held that these plaintiffs “alleged personal rights that... entitle them to standing.” Id. at 245. The Maffei plaintiffs had standing, the court said, because “the plaintiffs’ claims are readily distinguishable from those of the general class of parishioner-beneficiaries.” Id. The charitable entity assets over which they brought suit— the land in one case, and the financial contributions in the other — had belonged to the plaintiffs in the past, and would belong to them in the future if they prevailed in their lawsuit. No other parishioners could make that claim, and thus the interests of these plaintiffs were specific and personal enough to give them standing to litigate the church’s alleged misuse of those assets.[5]
If the general class of parishioners of the church lacked standing in Maffei, then the general class of students at the University lacks standing here, by the same reasoning. Supreme Judicial Court precedent on this point could hardly be clearer.
For example, Weaver v. Wood, 425 Mass. 270 (1997), arose when members of the Christian Science Church objected to church investments in ventures in electronic media. The church members claimed that this investment decision violated the church’s governing documents — just as Plaintiffs claim here that the investment decisions of the University’s President and Fellows violate the Charter of Harvard College. Even though the Weaver plaintiffs were “life-long members in good standing of the Church,” 425 Mass. at 274— just as Plaintiffs here are students in good standing at Harvard — the Supreme Judicial Court “conclude[d] under well-settled principles of law long enforced by this court that the plaintiffs do not have standing to obtain judicial redress in this matter.” Id. at 271.
In ruling that members of the church lacked standing to challenge the church’s investment decisions, the Weaver court noted that the Attorney General had always had the exclusive right and duty to decide whether to sue a charitable organization over the alleged misuse of its assets. Quoting from a decision that it had issued more than a century earlier, the court remarked that the law “has not left it to individuals to assume this duly” of suing over misuse of charitable assets. “Nor can it be doubted that such a duly can be more satisfactorily performed by one acting under official responsibility [that is, the Attorney General] than by individuals, however honorable their character and motives maybe.” Id. at 275 quoting Burbank v. Burbank, 152 Mass. 254, 256 (1890).
The Supreme Judicial Court has made similar rulings in cases involving governance of Harvard University itself. For example, Ames v. Attorney General, 332 Mass. 246 (1955), concerned the University’s management of the Arnold Arboretum in West Roxbuiy, run by Harvard as the “trustee of a public charitable trust.” Id. at 247. When Harvard decided to move the main body of the Arboretum’s library and herbarium to Cambridge, the plaintiffs attempted to convince the Attorney General to challenge the decision. Failing in that effort, the plaintiffs sued the Attorney General, asking the court to force him to intervene. The plaintiffs claimed standing as financial contributors to the Arboretum who were actively interested in its welfare. In addition, all but two of them were “members of the visiting committee appointed by the board of overseers of [Harvard] College to visit the arboretum,” which was, the court noted, an advisory committee “with no rights or powers.” Id. at 249. Although these plaintiffs were members of the Harvard community as financial contributors and officially recognized advisers to the Harvard administration, the court said, “We are not convinced that the petitioners, with no other interest other than that of the general public, have any legal right to demand a decision of the court.” Id. at 252. See also Harvard Law School Coalition for Civil Rights v. President & Fellows of Harvard College, 413 Mass. 66 (1992) (rejecting student standing, albeit under statutes not at issue in today’s case, to challenge the allegedly discriminatory faculty hiring practices of Harvard Law School).
The cases on which Plaintiffs rely do not support Plaintiffs entitlement to standing. As one example, Trustees of Andover Theological Seminary v. Visitors of the Theological Institution in Phillips Academy in Andover, 253 Mass. 256 (1925), concerned a challenge to a plan by the trustees of a theological seminary to more closely affiliate that entity with Harvard Divinity School. The court held that the Board of Visitors of Andover Theological Seminary had standing to mount such a challenge, because that Board of Visitors had been created at the founding of that seminary and given a “wide sweep of powers,” id. at 255 “to see to it that there was no deviation in the management of that institution from the declared purposes of the found *532 ers,” id. at 266, because the founders “were unwilling to trust the trustees with the management of their foundation in its theological aspects.” Id. However, none of the litigants in that case were students,[6] and nothing in the court’s opinion suggests that students at the seminary — who stood on far different footing than the institution’s Board of Visitors — had standing to challenge the trustees’ decisions about management of the seminary.
In fact, at least one case central to Plaintiffs’ argument actually supports the position of Harvard and the Attorney General. In Lopez v. Medford Community Center, Inc., 384 Mass. 163 (1981), the court ruled that persons claiming to be members of a charitable corporation organized for civic and educational purposes had no standing to sue the organization over alleged corporate mismanagement. “It remains the general rule that ‘it is the exclusive function of the Attorney General to correct abuses in the administration of a public charily by the institution of proper proceedings.’ ” Id. at 167, quoting Ames, 332 Mass. at 250-51. The court allowed the Lopez plaintiffs to litigate only the issue of whether they had been unlawfully denied membership status in the charitable organization. Here, Plaintiffs do not allege that the Universily has denied them student status.
In short, like the rights of “parishioner-beneficiaries” of the Catholic parish in Maffei, or the rights of “life-long members in good standing” of the Christian Science Church in Weaver, the rights of “students at Harvard Universily” are widely shared, because Harvard Universily has thousands of students. Plaintiffs’ status as Harvard students, therefore, does not endow them with personal rights specific to them that would give them standing to charge Harvard with mismanagement of its charitable assets.
B. Standing to Sue Based on Particular Alleged Impacts
Plaintiffs also argue for standing on the theory that Harvard’s investment in fossil fuel companies has impacts that interfere with rights personal to them. The education of each of the Plaintiffs suffers “dimin-ishment,” they allege, because Harvard’s investment is funding “fossil fuel companies’ promotion of scientific falsehoods,” which “distorts academic research into scientific remedies for climate change and stymies efforts to make the transition to a clean energy economy.” Complaint T3I57-62. This funded-by-Harvard “distortion of] academic research” results in “dimin-ishment” of the educations of Plaintiff Cherry, Skaggs, and Hamilton in environmental law, the educations of Plaintiffs Rothstein and Frederick in history and literature as they prepare for careers in renewable energy and journalism, the education of Plaintiff Franta as he studies renewable energy technology in preparation for a career as a renewable energy scientist, and the education of Plaintiff Kivel in biology as she prepares for a career as an organic farmer. The “climate change denial” funded by Harvard also allegedly “has a chilling effect on academic freedom and the willingness of faculty, students, and administrators to publicly confront climate change,” and impedes the ability of Plaintiffs “to associate with like-minded colleagues and to avail themselves of the open scholarly environment' that Defendant Harvard Corporation has a duly to maintain.” Id., ¶55.
This argument for standing suffers from at least two flaws.
First, the universe of Harvard students who could claim these particular negative impacts is far broader than just these seven Plaintiffs. The basic right at issue, to learn in an academic environment unpolluted by scientific falsehoods, is held by the entire Harvard student body.
If the measuring rod for standing instead is the impact of these particular alleged falsehoods on a particular student’s course of study, the pool of affected students is still quite large. The Complaint itself alleges that these falsehoods diminish the education of students in courses of study as diverse as renewable energy technology, id., ¶58, “organismic and evolutionary biology,” id., ¶61, and history and literature. Id., ¶¶59, 62. But every Harvard student studying any aspect of environmental law or energy law is suffering the same “diminishment” of his or her education as that alleged by Plaintiffs Cherry, Skaggs, and Hamilton. Every Harvard student studying any aspect of science or engineering, relating at the very least to evolutionary biology, or the use of energy, or man-made impacts on our environment, or climate change, is suffering the same “diminishment” of his or her education as that alleged by Plaintiffs Franta and Kivel. In other words, the harm resulting from Harvard’s financing of alleged scientific falsehoods by the fossil fuel industry is not personal to these seven Plaintiffs, in the way that the loss of their land was personal to the Maffei parishioners who donated that land for the construction of the church.
The second problem with Plaintiffs theory is that the allegations on which it is based are too speculative and conclusory to pass the test of Iannacchino v. Ford Motor Co., 451 Mass. 623 (2008). While Iannacchino requires me to accept the allegations of the Complaint as true in deciding these motions to dismiss, it also requires me to “look beyond the conclusory allegations in the complaint,” Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 675 (2011), and to determine if the nonmoving party has pled “factual allegations plausibly suggesting (not merely consistent with) an entitlement to relief,” which “must be enough to raise a right to relief above the speculative level.” Iannacchino, 451 Mass. at 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 545 (2007). The allegations of this Complaint, as they attempt to connect Harvard’s fossil fuel investments with the “diminishment” of Plaintiffs’ *533 educations and a chilling of academic freedom, are simply too speculative.
First, the allegations of the Complaint fail to account for breaks in the chain of causation leading from Harvard’s investment in fossil fuel companies to the “diminishment” of Plaintiffs’ educations. If this court ultimately directed Harvard to divest itself of all fossil fuel stocks, the fossil fuel companies would still exist, would still have every motive to continue to spread the alleged scientific falsehoods, and would certainly have the resources to continue to do so. The Complaint does not allege otherwise.
Second, although the Complaint alleges in conclus-oiy fashion that Harvard’s investment in fossil fuel companies “has a chilling effect on academic freedom and the willingness of faculty, students, and administrators to publicly confront climate change,” Complaint ¶55, it leaves entirely to speculation how this can be so. Harvard’s fossil fuel investments certainly have not interfered with the academic freedom, or the intellectual capability, of these Plaintiffs, who allege that they have successfully identified as false the fossil fuel companies’ statements denying climate change. The Complaint also makes obvious that Harvard’s investment in fossil fuel companies has not chilled academic debate on the topic of climate change; indeed, one of the putative Plaintiffs is a campus organization whose function is to “educate the Harvard community about the facts of climate change and advocate for environmental and climate justice.” Id., ¶2. The very existence of this lawsuit, filed by members of the Harvard community to stop Harvard from investing in fossil fuel companies, shows that Plaintiffs have failed to plead facts “plausibly suggesting” that Harvard’s fossil fuel investments have had “a chilling effect on . . . the willingness of faculty, students, and administrators to publicly confront climate change.” Id., ¶55.
In fact, other allegations in the Complaint and its exhibits point out the entirely speculative nature of Plaintiffs’ allegation that Harvard’s investment in fossil fuels has chilled academic freedom and affected the willingness of members of the Harvard community to publicly confront climate change. The Complaint acknowledges that Harvard “has recognized its obligation as an economic and intellectual leader to respond to climate change,” id., ¶31 — and at the highest levels of the University at that. As Plaintiffs point out, “Harvard President Drew Faust has stated that ‘climate change poses a serious threat to our future — and increasingly to our present.’ ” Plaintiffs’ Memorandum in Opposition to Defendant President and Fellows of Harvard College and Harvard Management Company, Inc.’s Motion to Dismiss (“Opp. to Harvard’s Motion”) at 2. Plaintiffs are quoting the opening sentence of a three-page letter dated April 7, 2014 from President Faust to “Members of the Harvard Community,”[7] where she says that “[w]orldwide scientific consensus has clearly established” this serious threat to our future and our present. Exhibit J to Complaint at 1. Although in this letter President Faust reaffirms Harvard’s decision not to divest from the fossil fuel industry, id. at 2, she also describes at length Harvard’s academic research efforts to find solutions to climate change, Harvard’s institutional efforts to reduce its own greenhouse gas emissions, and Harvard’s efforts in its role as an investor to consider environmental, social and governance issues among the many factors that inform its investment decisions. Id. at 3.
“Alleged injury that is ‘speculative, remote, and indirect’ will not suffice to confer standing”; rather, the alleged injury “must be a direct consequence of the complained of action. Brantley v. Hampden Div. of Family and Probate Court Dept. 457 Mass. 172, 181 (2010), quoting Ginther v. Comm’r of Ins., 427 Mass. 319, 323 (1998). ’’Speculative, remote, and indirect" is a fair description of the allegations of the Complaint about how Harvard’s investment in fossil fuel companies diminishes Plaintiffs’ educations and chills debate at Harvard about climate change. More is required to establish standing.
In summary, although the Complaint alleges that Harvard’s investment in fossil fuel companies diminishes Plaintiffs’ educations, chills academic freedom, and makes students, faculty and administrators reluctant to confront climate change, those alleged impacts are not sufficiently personal to Plaintiffs to form a foundation for their standing to challenge how Harvard invests its endowment. Even if this were not so, those allegations are too conclusoiy and speculative to pass muster under Iannacchino, and cannot form a foundation for Plaintiffs’ standing for that reason as well. Count I therefore must be dismissed, because Plaintiffs lack standing to bring it.[8]
2. Intentional Investment in Abnormally Dangerous Activities
In Count II, Plaintiffs assert the right of “Future Generations” to be free of what the Plaintiffs call “Intentional Investment in Abnormally Dangerous Activities.” Plaintiffs refer to this count as a tort claim, see Opp. to Harvard’s Motion at 15, 16, even though they seek an injunction rather than the usual tort remedy of money damages. This claim, too, must be dismissed, for three independent reasons.
First, as Plaintiffs conceded at oral argument, no court in any jurisdiction has ever recognized this proposed new tort. Plaintiffs are certainly entitled to argue for an extension of existing law, even to seek recognition of what Plaintiffs suggest is a new or extreme theory of liability." Id. at 15, quoting Jenkins v. Jenkins, 15 Mass.App.Ct. 934, 934 (1983) (rescript opinion). However, a Superior Court judge, bound by existing precedent, must be circumspect in that regard, because it is more properly the function of the Supreme Judicial Court (or the state legislature) to *534 extend the law by creating a new tort. And, indeed, that is exactly what happened at the birth of the tort of intentional infliction of emotional distress, cited by Plaintiffs as precedent; the Superior Court judge dismissed the complaint alleging this then-nonexistent tort, leaving it to the Supreme Judicial Court to recognize the tort on appeal. See George v. Jordan Marsh Co., 359 Mass. 244 (1971).
Second, Plaintiffs actually seek not one but two extensions of existing law. Plaintiffs apparently do not bring Count II on their own behalves; instead “Plaintiffs assert Plaintiffs Future Generations’ rights on their behalf.” Complaint ¶¶71-73. They must do this, Plaintiffs allege, because Future Generations, whom the Complaint defines as “individuals not yet born or too young to assert their rights,” id., ¶2, are “unable to appear before the court.” Id., ¶71. Therefore Count II, like Count I, raises the issue of standing.
Plaintiffs point out that a disinterested adult can be appointed by a court to “represent a child’s basic welfare rights as a guardian ad litem.” Opp. to Harvard’s Motion at 18, citing G.L.c. 215, §56A. But Plaintiffs have not moved for such an appointment, probably because that statute apples only in the Probate Court and limits the guardian’s duties to investigating and reporting on the “care, custody and maintenance of minor children.” Id. Plaintiffs’ unilateral assertion of the interests of every not-yet-born or young person on earth is a far cry from representing the interests of a single child as guardian ad litem after convincing a court that such representation is necessary and that the proposed guardian is an appropriate person to provide it. I am unwilling to make this second extension of existing law by granting Plaintiffs a roving commission to litigate on behalf of Future Generations.
Finally, the overarching problem with Plaintiffs’ position — again, like standing, arising as to both counts of their Complaint — is the absence of any limits on the subj ect matter and scope of lawsuits of this sort. These Plaintiffs assert that climate change is such a serious problem that they are entitled, on behalf of Future Generations, to seek a court order requiring Harvard to divest itself of fossil fuel company investments. Tomorrow another group of students may decide that the most pressing need of Future Generations of Allston and Cambridge is for green space, and so that student group may seek a court order requiring Harvard to abandon its plans to redevelop its properly in Allston into academic buildings and instead build a park on that land. Or perhaps today’s Plaintiffs, whose Complaint makes clear that they believe that fossil fuel companies are promoting “scientific falsehoods . . . [that] distort! ] academic research” at Harvard, Complaint ¶57, will petition the court to ban such “falsehoods” from the Harvard curriculum so that Future Generations of Harvard students will not have their academic research distorted.
Plaintiffs apparently recognize that the governance of universities would be thrown into chaos if courts were to permit lawsuits such as this one to proceed, because Plaintiffs attempt to downplay that risk by pointing to a supposed limiting principle: “While we refrain to speculate whether any investments other than those in fossil fuels could rise to the level of certain and pervasive harm described in the Complaint, the exceptional risks posed by climate change readily provide a limiting principle.” Opp. to Harvard’s Motion at 8 n.3. Put more bluntly, the limiting principle, Plaintiffs assert, is that climate change is the most serious threat facing the world. These Plaintiffs fervently believe that, and perhaps they are right. But other students believe just as fervently in other causes. If Plaintiffs can bring this lawsuit, nothing would prevent other students from seeking court orders that Harvard — or any other charitable organization — take other actions to deal with the “exceptional risks” posed by whatever danger to Future Generations those other students fear above all others. Plaintiffs’ suggested limiting principle imposes no limits at all.
I decline to recognize the tort of intentional investment in abnormally dangerous activities, or to allow these Plaintiffs to assert the rights of Future Generations. Count II must be dismissed.
Conclusion and Order
Plaintiffs note that Harvard “has several times chosen to divest from morally repugnant sectors.” Opp. to Harvard’s Motion at 3 (emphasis added). In none of those cases was Harvard ordered to do so by a court. Plaintiffs have brought their advocacy, fervent and articulate and admirable as it is, to a forum that cannot grant the relief they seek.
The President and Fellows of Harvard College and Harvard Management Company, Inc.’s Motion to Dismiss is ALLOWED. The Commonwealth’s Motion to Dismiss is ALLOWED. This case is DISMISSED.

 Plaintiff s point to no precedent for naming “Future Generations” as a plaintiff in a lawsuit, and the parties disagree about whether an unincorporated association can sue in its own name. Because the individual plaintiffs have the capacity to file a lawsuit, I need not decide whether Future Generations and the Harvard Climate Justice Coalition are proper plaintiffs. In this Memorandum of Decision and Order, I will use the word “Plaintiffs” to refer to the seven individual plaintiffs.

 Defendant Harvard Management Company, Inc. joins in the University’s motion to dismiss, which means that all three Defendants are seeking dismissal.

 An older case to the same effect is Trustees of Dartmouth College v. Quincy, 313 Mass. 219, 225 (1954), where the court held that the plaintiff college had standing to challenge the administration of a trust fund because the college would be entitled to the entire fund upon the occurrence of a contin *535 gency, and the college’s lawsuit raised the question of whether that contingency had occurred.

 The rights of students to challenge the reorganization of a divinity school was at issue in a much more recent case from another jurisdiction, Russell v. Yale University, 54 Conn.App. 573 (1999). There the Appellate Court of Connecticut held that the students lacked standing because, “absent special injury to a student or his or her fundamental rights, students do not have standing to challenge the manner in which the administration manages an institution of higher education.” Id. at 579. Plaintiffs attempt to distinguish Russell by pointing out that they, unlike the Russell plaintiffs, do plead special injury. However, as explained elsewhere in this Memorandum and Order, Plaintiffs’ allegations of special injury are insufficient for a variety of reasons.

 Although ordinarily a court deciding a motion to dismiss may consider only the allegations in the complaint itself, I may consider this document in deciding these motions to dismiss because Plaintiffs have attached it to the Complaint and referred to its terms in the Complaint. See Schaer v. Brandeis Univ., 432 Mass. 474, 477 (2000), quoting 5A C.A. Wright & A.R. Miller, Federal Practice and Procedure §1357, at 299 (1990).

 Harvard also argues for dismissal of this count on the ground that the Complaint fails to allege that the President and Fellows have misappropriated charitable assets or engaged in self-dealing with regard to those assets, which, Harvard says, are the only forms of mismanagement of charitable assets that are unlawful. In light of my ruling that Plaintiffs lack standing, I need not, and do not, reach this argument.