Fishman, Kenneth J., J.
During and after ingesting finasteride, the generic equivalent of the drug Prosear, the plaintiff, Brian Rafferty, experienced certain side effects. He commenced this action against the defendant Merck & Co., Inc. (“Merck”), the manufacturer of Prosear, and against the defendant Sidney Rubenstein, M.D., his prescribing physician, seeking damages for the harm he suffered as a result of ingesting finasteride. This case is before this Court on Merck’s motion to dismiss the claims against it. After hearing, and upon review and consideration, the motion is ALLOWED.
BACKGROUND
For purposes of a motion to dismiss under Rule 12(b)(6), the court must “accept as true the allegations in the complaint and draw every reasonable inference in favor of the plaintiff.” Curtis v. Herb Chambers 1-95, Inc., 458 Mass. 674, 676 (2011).
Merck is the manufacturer of Prosear, which the Food and Drug Administration (“FDA”) approved in 1992 for the treatment of benign prostatic hyperpla-sia, le., enlarged prostate. Between 2008 and 2010, Merck changed the label on the Prosear it sold in Sweden, the United Kingdom, and Italy to warn that “erectile dysfunction [persists] after discontinuation of treatment . . .” Complaint, pars. 21-23. As of 2010, however, the Prosear label in the United States indicated that side effects related to sexual dysfunction could occur in a limited number of users, and that they resolve after use of Prosear is discontinued.
In August 2010, Rubenstein prescribed finasteride to Rafferty to treat his enlarged prostate. Rubenstein did not warn Rafferty of any side effects associated with taking finasteride. After he started ingesting finasteride, Rafferty experienced side effects relating to sexual dysfunction and hypogonadism, including erectile dysfunction and decrease in libido. Rafferty weaned himself off finasteride in October 2010, and his symptoms ceased for approximately two weeks. Thereafter, in late October and early November 2010, his symptoms returned along with new symptoms. Eventually, specialists diagnosed Rafferty with hypergonadism and androgen deficiency which the finasteride had induced. In March 2011, Rafferty began treatment which will continue indefinitely.
DISCUSSION
I. Standard of Review
A party moving to dismiss pursuant to Mass.R.Civ.P. 12(b)(6) contends that the complaint fails “to state a claim upon which relief can be granted . . .” “While a complaint attacked by a . . . motion to dismiss does not need detailed factual allegations . . . a plaintiffs obligation to provide the ‘grounds’ of his ‘entitle[ment] to relief requires more than labels and conclusions ...” Iannacchino v. Ford Motor Co., 451 Mass. 623, 636 (2008), quoting Bell Atl. Corp. v. Twombly, 550 U.S. 544, 555 (2007). “Factual allegations must be enough to raise a right to relief above the speculative level . . . [based] on the assumption that all the allegations in the complaint are true (even if doubtful in fact) . . .” Id., quoting Bell Atl. Corp., 550 U.S. at 555. Therefore, the pleading stage requires “factual ‘allegations plausibly suggesting (not merely consistent with)’ an entitlement to relief, in order to ‘reflect! ] the threshold requirement of [Fed.R.Civ.P.] 8(a)(2) that the ’’plain statement" possess enough heft to “sho[w] that the pleader is entitled to relief.” ’ “ Id., quoting Bell Atl. Corp., 550 U.S. at 557.
*465 II. Legal Framework
“Any person may file with the Secretary [of the FDA] an application with respect to any drug.” 21 U.S.C. §355(b)(l). “In the case of a new brand-name drug, FDA approval can be secured only by submitting a new-drug application” or “NDA,” which “is a compilation of materials that must include ‘full reports of [all clinical] investigations,’ [21 U.S.C.] §355(b)(l)(A), relevant nonclinical studies, and ‘any other data or information relevant to an evaluation of the safety and effectiveness of the drug product obtained or otherwise received by the applicant from any source,’ 21 C.F.R. §§314.50(d)(2) and (5)(iv) (2012).” Mutual Pharm. Co., Inc. v. Bartlett, 133 S.Ct. 2466, 2470-71 (2013) (“Bartlett’). “The NDA must also include ‘the labeling proposed to be used for such drug,’ 21 U.S.C. §355(b)(l)(F); 21 C.F.R. §314.50(c)(2)(I), and ‘a discussion of why the [drug’s] benefits exceed the risks under the conditions stated in the labeling,’ 21 C.F.R §314.50(d)(5)(viii); [21 C.F.R] §314.50(c)(2)(ix).” Id. at 2471. “The FDA may approve an NDA only if it determines that the drug in question is ‘safe for use’ under ‘the conditions of use prescribed, recommended, or suggested in the proposed labeling thereof.’ ” Id., quoting 21 U.S.C. §355(d).
As this process “is both onerous and lengthy!,] • • • Congress passed the Drug Price Competition and Patent Term Restoration Act of 1984 . . . , popularly known as the ‘Hatch-Waxman Act[,]’ ” pursuant to which “a generic drug may be approved without the same level of clinical testing required for approval of a new brand-name drug, provided the generic drug is identical to the already-approved brand-name drug in several key respects.” Id.; see PLIVA, Inc. v. Mensing, 564 U.S. 604, 612 (2011) (“Mensing”) (“Under this law, ‘generic drugs’ can gain FDA approval simply by showing equivalence to a reference listed drug that has already been approved by the FDA[,] . . . [thereby] allowing] manufacturers to develop generic drugs inexpensively, without duplicating the clinical trials already performed on the equivalent brand-name drug”). “First, the proposed generic drug must be chemically equivalent to the approved brand-name drug: it must have the same ‘active ingredient’ or ‘active ingredients,’ ‘route of administration,’ ‘dosage form,’ and ‘strength’ as its brand-name counterpart.” Bartlett, 133 S.Ct. at 2471, quoting 21 U.S.C. §355(])(2)(A)(ii), (iii). “Second, a proposed generic must be ‘bioequivalent’ to an approved brand-name drug[,]” id., quoting 21 U.S.C. §355(j)(2)(A)(iv), “[t]hat is, it must have the same ‘rate and extent of absorption’ as the brand-name drug.” Id., quoting 21 U.S.C. §355(j)(8)(B). “Third, the generic drug manufacturer must show that ‘the labeling proposed for the new drug is the same as the labeling approved for the [approved brand-name] drug.’ ” Id., quoting 21 U.S.C. §355(])(2)(A)(v). Generic drug manufacturers make this showing by submitting an abbreviated new drug application (“ANDA”). 21 U.S.C. §355(j)(2).
“Once a drug—whether generic or brand-name—is approved, the manufacturer is prohibited from making any major changes to the ‘qualitative or quantitative formulation of the drug product, including active ingredients, or in the specifications provided in the approved application.’ ” Bartlett, 133 S.Ct. at 2471, quoting 21 C.F.R. §314.70(b)(2)(I). “Generic manufacturers are also prohibited from making any unilateral changes to a drug’s label.” Id., citing 21 C.F.R. §314.94(a)(8)(iii), 21 C.F.R. §314.150(b)(10); see id. at 2476 (“[FJederal law prevents generic drug applications from changing their labels”); Mensing, 564 U.S. at 617 (same). Compare 21 C.F.R. §314.70(c) (6) (iii) (permitting brand-name drug manufacturers to strengthen warnings or instructions using “changes-being-effected” (“CBE”) process; “[t]hey need only simultaneously file a supplemental application with the FDA”).
As a result of the Hatch-Waxman Act, then, “brand-name and generic drug manufacturers have different federal drug labeling duties. A brand-name manufacturer seeking new drug approval is responsible for the accuracy and adequacy of its label.” Mensing, 564 U.S. at 613, citing 21 U.S.C. §355(b)(l), (d). “A manufacturer seeking generic drug approval, on the other hand, is responsible for ensuring that its warning label is the same as the brand name’s.” Id., citing 21 U.S.C. §355(j)(2)(A)(v), 21 U.S.C. §355(j)(4)(G), 21 C.F.R. §314.94(a)(8), 21 C.F.R. §314.127(a)(7).
The two recent United States Supreme Court decisions cited above confirmed these differing duties. First, in Mensing, the question before the Court was “whether federal drug regulations applicable to generic drug manufacturers directly conflict with, and thus pre-empt, .. . state-law [product liability] claims.” 564 U.S. at 609. Under the state laws at issue, “all drug manufacturers [have a duty] to adequately and safely label their products.” Id. at 617. Federal drug regulations, however, prevent generic drug manufacturers “from independently changing their generic drugs’ safety labels.” Id. Federal law pre-empts state law “where it is impossible for a private party to comply with both state and federal requirements.” Id. at 618 (citation omitted). The Court found impossibility in Mensing because “[i]t was not lawful under federal law for the [generic] [m]anufacturers to do what state law required of them . . . [and if they] had independently changed their labels to satisfy their state-law duly, they would have violated federal law.” Id. The Court therefore concluded that the federal drug regulations pre-empted the plaintiffs’ state tort-law claims alleging that the generic manufacturers had failed to provide adequate warning labels. Id. at 608-09, 618.
Second, in Bartlett, the Court “decide[d] whether federal law pre-empt[ed] the [state law] design-defect claim ... [which] impose[d] a duly on manufacturers to ensure that the drugs they market are not unreasonably unsafe . . . [through] both [the drugs’] chemical properties and the adequacy of [their] warnings.” 133 S.Ct. at 2470. As *466 federal law “requires a generic drug to have the same active ingredients, route of administration, dosage form, strength, and labeling as the brand-name drug on which it is based!,]” the generic manufacturer could not legally change the composition of the drug at issue. Id. at 2475, citing 21 U.S.C. §355(j)(2)(A)(ii)-(v), 21 U.S.C. §355(j)(8)(B). “Given the impossibility of redesigning [the drug], the only way for [the generic manufacturer] to ameliorate the drug’s ‘risk-utility profile—and thus to escape liability [under state law]—was to strengthen ‘the presence and efficacy of [the drug’s] warning’ . . .” Id. (alteration omitted). “As [Mensing] made clear, [however], federal law prevents generic drug manufacturers from changing their labels.” Id. at 2476, citing Mensing, 564 U.S. at 617. Therefore, the Court held “that the state-law design-defect claims that turn on the adequacy of a drug’s warnings are pre-empted by federal law . . .” Id. at 2470, 2477.
III. Analysis
Acknowledging that he is essentially foreclosed from bringing failure to warn claims against the generic manufacturer of finasteride, Rafferty alleges that Merck, as the brand-name manufacturer, had a duty to maintain the accuracy of the labels for those individuals who would rely on those labels; that duty, he asserts, extends to individuals who ingest the generic equivalent of Merck’s brand-name drug. Merck argues that Massachusetts does not recognize this theory of relief, le., the innovator liability theoiy,[2] therefore, as Rafferty did not ingest the drug that Merck manufactured, Merck owes Rafferty no duty of care and Rafferty’s claims must be dismissed. Massachusetts appellate courts have not addressed the issue of whether a plaintiff who ingested a generic drug can hold the brand-name manufacturer liable for an allegedly inaccurate label.[3] The analysis, however, combines two well-established legal principles.
First, “[a] plaintiff who sues a particular manufacturer for product liability generally must be able to prove that the item which it is claimed caused the injury can be traced to that specific manufacturer.” Mathers v. Midland-Ross Corp., 403 Mass. 688, 691 (1989). Simply “issuing] instructions concerning the use of [the] kind of’ product that caused the injury is not enough of a connection to the product to impose liability on the manufacturer. Id. (emphasis added).
Second, relatedly, while “[a] manufacturer of a product has a duly to warn foreseeable users of dangers in the use of that product!,]” Massachusetts courts “have never held a manufacturer liable ... for failure to warn of risks created solely in the use or misuse of the product of another manufacturer.” Mitchell v. Sky Climber, Inc., 396 Mass. 629, 631 (1986) (emphasis added), citing Carrier v. Riddell, Inc., 721 F.2d 867, 869-70 (1st Cir. 1983). “The prevailing view is that a supplier of a component part containing no latent defect has no duly to warn the subsequent assembler or its customers of any danger that may arise after the components are assembled.” Id.
Reading these legal principles together supports the conclusion that Rafferty cannot hold Merck liable for the harm he allegedly sustained. Merck did not manufacture the finasteride, and although Merck did generate the information contained in the label that the generic manufacturer eventually used, it did not affirmatively supply the generic manufacturer with that information. See Kelly v. Wyeth, MICV2003-03314, 2005 WL 4056740, *4 (Middlesex Super.Ct. May 6, 2005) (Smith, J.) (concluding that brand-name defendant had “not voluntarily assume[d] a duty to [the plaintiff] to provide to her accurate and complete information regarding [the drug’s] side effects” where it had not provided plaintiff herself with any information about generic drug she had ingested (emphasis added)). Therefore, Rafferty has not alleged facts that plausibly suggest a connection between Merck and the product that harmed him, where that connection must be more than merely supplying a part of the product or instructions for that type of product.[4]
General negligence principles also support this conclusion. The plaintiff is correct that “all persons have a duty to exercise reasonable care in their own conduct to avoid harming others where the risk of harm is foreseeable to the actor.” Roe No. 1 v. Children’s Hosp. Med. Ctr., 469 Mass. 710, 713 (2014); Lind v. Domino’s Pizza LLC, 87 Mass.App.Ct. 650, 659 (2015); see Meridian at Windchime, Inc. v. Earth Tech, Inc., 81 Mass.App.Ct. 128, 132 (2012) (“In Massachusetts, duty is ‘determined by balancing the foreseeability of harm, in light of all the circumstances, against the burden to be imposed’ ”). Even assuming that it is foreseeable that an individual who ingests a generic drug will receive and rely on the label for the brand-name drug,[5] the question of whether a defendant owes a plaintiff a duty of reasonable care “is [also] decided ‘by reference to existing social values and customs and appropriate social policy.’ ” Roe No. 1, 469 Mass, at 713-14, quoting Coombes v. Florio, 450 Mass. 182, 187 (2007).
In Huck v. Wyeth, Inc., 850 N.W.2d 353, 370 (Iowa 2014), a decision this Court finds to be instructive on this issue, the Supreme Court of Iowa considered public policy as one of the “three principal rationales” that led it “[to] conclud[e] ‘brand name manufacturers are not liable to consumers of generic drugs’ . . .”[6] First, the court noted that “Congress has created a symbiotic relationship between brand and generic drug manufacturers,” pursuant to which “ ‘[n]ame brand manufacturers undertake the expense of developing pioneer drugs’ while ‘[g]eneric manufacturers avoid these expenses by duplicating successful pioneer drugs and their labels.’ ” Id. at 376, quoting Foster, 29 F.3d at 170. “[A]s between these competing pharmaceutical companies, it would be ‘especially unfair’ to find brand manufacturers have a duly to those who take generic drugs ‘when, as here, the generic manufacturer reaps the benefits of the name *467 brand manufacturer’s statements by copying its labels and riding on the coattails of its advertising.” Huck, 850 N.W.2d at 376, quoting Foster, 29 F.3d at 170. Neither “the Hatch-Waxman [Act] [nor] congressional record suggested] Congress intended to render brand defendants liable to consumers of generic products.” Huck, 850 N.W.2d at 377. Therefore, “[t]o impose such liability would alter the relationship between generic and brand manufacturers” as it “would discourage investments necessary to develop new, beneficial drugs by increasing the downside risk.” Id.
Second, “courts are not institutionally qualified to balance the complex, interrelated, and divergent policy considerations in determining labeling and liability obligations of brand and generic pharmaceuticals. Courts deal ad hoc with the record made by private litigants. By contrast, the FDA . . . engages in public rulemaking allowing transparent input from all interest groups, guided by its own staff of qualified scientists.” Id.; cf. Harvard Climate Justice Coal v. President & Fellows of Harvard Coll., SUCV2014-03620, 2015 WL 1519036, *8 (March 17, 2015) (Wilson, J.) [32 Mass. L. Rptr. 529] (declining to recognize proposed new tort, reasoning that “a Superior Court judge, bound by existing precedent, must be circumspect in that regard, because it is more properly the function of the Supreme Judicial Court (or the state legislature) to extend the law by creating a new tort”).
Third, “[liability generally follows control in... tort law.” Huck, 850 N.W.2d at 378. The brand manufacturers, however, did “not place [the generic] product in commerce, ha[d] no ability to control the quality of the product or the conformance of the product with its design, and d[id] not have the opportunity to treat the risk of producing the product as a cost of production against which liability insurance can be obtained.’ ” Id., quoting Am.L.Prod.Liab.3d §5:10. Products liability law seeks “to place responsibility for the harm caused by a product on the party who profits from its manufacture and sale.” Id. Further, the brand-name manufacturers “cannot ensure that a generic manufacturer complies with federal law—the two are, after all, competitors.” Id. (emphasis in original). Therefore, although brand-name manufacturers “control the brand label,” and “incur[ ] the costs to develop” the brand-name drug, they “do not otherwise control” the generic manufacturers, and “do not profit from the [generic manufacturers’] sale of the competing generic formulation[s].” Id. at 379.
Accordingly, even if it is foreseeable that the individuals ingesting the generic formulation will rely on a brand-name drug’s label, “public policy considerations weigh against holding name-brand competitors liable for injuries caused by their generic competitor’s drugs.” Id. at 371.
This Court, of course, is concerned that due to the bar to recovery from the generic manufacturers resulting from federal preemption and the protection afforded the brand manufacturers flowing from the principles discussed above, an injured party may be unfairly denied relief resulting from inadequate or erroneous warnings on pharmaceutical drugs. The Supreme Court has recognized this “unfortunate” result as well. Mensing, 564 U.S. at 625 (“acknowledging] the unfortunate hand that federal drug regulation has dealt” plaintiffs who ingested generic drugs).[7] While a proposed change in federal regulations may resolve this result, it is undoubtedly of no comfort to the plaintiff in this action.
Specifically, the FDA has proposed amendments to its regulations in order to “create parity among [drug man- • ufacturers] with respect to . . . labeling changes by permitting holders of [ANDAs, i.e., generic drug manufacturers] to distribute revised product labeling that-differs in certain respects, on a temporary basis, from the labeling of its reference listed drug [(’RLDj, i.e., the brand-name drug to which it is equivalent,] . . . upon submission to FDA of a ‘changes being effected’ . . . supplement.” Supplemental Applications Proposing Labeling Changes for Approved Drugs and Biological Products, 78 Fed.Reg. 67,985, 67,985, 67,989 (proposed Nov. 13, 2013) (to be codified at 21 C.F.R. sec 314.70(b)(2), (c)(6), (c)(8), and §601.12(f)(2)). The FDA explained its reasons for proposing these amendments. First,
[a]t the time of FDA’s adoption of the generic drug regulations in 1992, FDA believed it was important that product labeling for the RLD and any generic drugs be the same to assure physicians and patients that generic drugs were, indeed, equivalent to their RLD. However, as the generic drug industry has matured and captured an increasing share of the market, tension has grown between the requirement that a generic drug have the same labeling as its RLD, which facilitates substitution of a generic drug for the prescribed product, and the need for an ANDA holder to be able to independently update its labeling as part of its independent responsibility to ensure that the labeling is accurate and up-to-date . . . FDA believes it is time to provide ANDA holders with the means to update product labeling to reflect data obtained through postmarketing surveillance, even though this will result in temporary labeling differences among products.
Id. at 67,988.
Second, “[i]n two recent cases [Mensing and Wyeth v. Levine, 555 U.S. 555 (2009)], the United States Supreme Court considered the issue of whether Federal law preempts State law tort claims against pharmaceutical manufacturers for failing to provide adequate warnings in drug product labeling . . .” Supplemental Applications Proposing Labeling Changes for Approved Drugs and Biological Products, 78 Fed.Reg. at 67,988. As a result of the decisions in those cases, “an individual can bring a product liabilily action for failure to warn against an NDA holder,[8] but generally not an ANDA holder, and thus access to the courts is dependent on whether an individ *468 ual is dispensed a brand name or generic drug.” Id. “The Mensing decision alters the incentives for generic drug manufacturers to comply with current requirements to conduct robust postmarketing surveillance, evaluation, and reporting, and to ensure that the labeling for their drugs is accurate and up-to-date.” Id. at 67,988-67,989.
Thus, while this proposal may ultimately enable recovery against the generic manufacturer, it does not evince, as the plaintiff suggests, a change in policy toward adoption of innovator liability in the context of brand manufacturer liability where that company did not make the drug that caused injury. Rather, this proposal simply reflects that the FDA is aware that the current state of the law prohibits individuals who have ingested generic drugs from holding any entity liable for inaccurate labels, and that, with the proposal, the FDA seeks to change that situation in a manner that may permit generic manufacturer liability. Accordingly, Merck’s motion to dismiss Rafferty’s claims of negligence and failure to warn (Count I) and violation of G.L.c. 93A (Count II)[9] must be allowed.
ORDER
For the foregoing reasons, Merck’s motion to dismiss Counts I and II is ALLOWED.

 “Innovator liability is a common law cause of action that holds a brand-name drug manufacturer liable when a plaintiff is injured by the generic version of that drug. To the minimal extent the innovator liability doctrine has been accepted by courts, [it] has only been applied in the chemical drug context.” Prachi V. Mehta, Expanding the Doctrine of Innovator Liability: Using Tort Liability to Create a Viable Follow-on Biologic Regime, 2014 U.Dl.J.L.Tech. & Pol’y 531, 550 (footnotes omitted).

 While Massachusetts appellate courts have not addressed this precise issue, a judge this Court has previously considered the question of “whether a brand name drug manufacturer can be held liable for injuries caused by the generic dmg manufactured by another company." Kelly v. Wyeth, MICV2003-03314, 2005 WL 4056740, *2 (Middlesex Super.Ct. May 6, 2005) (Smith, J.). Similar to Rafferty, the plaintiffs in that case argued that the defendant brand manufacturer had “a duty towards plaintiffs for whom not only [the brand-name drug] is prescribed, but also towards those who actually ingest a pharmacologically identical generic equivalent.” Id. at *3. The court concluded that the brand-name manufacturer “owed no duty to the users of a generic equivalent of one of [its] products” by relying on the pre-Mens-ing and Bartlett notion that “ ‘[m]anufacturers of generic drugs, like all other manufacturers are responsible for the representations they make regarding their products.’ ” Id. at *5, quoting Foster v. American Home Prods. Corp., 29 F.3d 165, 168 (4th Cir. 1994). The court also distinguished the two cases on which the plaintiff relied: Cottam v. CVS Pharmacy, 436 Mass. 316 (2002), which imposed a duty on a pharmacy because, “where a pharmacy undertakes to provide a customer with a list of a prescribed drug’s potential side effecfls], the pharmacy assumed a voluntary duty to the plaintiff to provide accurate and complete information on all of the drug’s side effects!,]” Kelly, 2005 WL 4056740, at *4 (emphasis added): and Carrier v. Riddell, Inc., 721 F.2d 867 (1st Cir. 1988), which rejected the plaintiffs argument that, even though the defendant had not manufactured the helmet the plaintiff had been wearing at the time of his injury, the defendant “was negligent in not providing a general warning about a football helmet’s limitations, and had [it] done so, the plaintiff would have taken additional precautions.” Kelly, 2005 WL 4056740, at *4 (emphasis added). This Court agrees that Cottam and Carrier are not controlling in the case at bar.

 A third legal principle is consistent with this conclusion. Pursuant to the apparent manufacturer doctrine, “[o]ne who puts out as his own product a chattel manufactured by another is subject to the same liability as if he were its manufacturer.” Lou v. Otis Elevator Co., 77 Mass.App.Ct. 571, 578 n.14 (2010) (citation omitted); see, e.g., Restatement (Third) of Torts: Products Liability §14, cmt. c (“When a commercial seller sells a product manufactured by another under its own trademark or logo, the seller is liable as though it were the manufacturer of the product. This rule applies even if the seller discloses that the product was produced by an identified manufacturer specifically for the seller. In this circumstance, the seller is presumed to cause the product to be used or consumed, in part at least, in reliance on the seller. The seller’s reputation is an implied assurance of the quality of the product, and the seller should be estopped from denying that it stands behind that assurance”). Although Bartlett and Mensing foreclose any attempt to fit generic manufacturers into the mold of apparent manufacturers, this doctrine makes clear that the liability analysis focuses on the party with the closer relationship to the plaintiff.

 Tliis Court declines to decide the question of foreseeability on these facts, except to note that hindsight should play no part in the analysis. See Foster v. American Home Prods. Corp., 29 F.3d 165, 171 (4th Cir. 1994); Huck v. Wyeth, Inc., 850 N.W.2d 353, 370 (Iowa 2014) (“[B]rand-name manufacturers’ warnings and representations do not create a basis for liability to consumers of competitors’ products because brand-name manufacturers only ‘intend! ] to communicate with their customers, not the customers of their competitors’ ”); cf. In re Goguen, 691 F.3d 62, 70 (1st Cir. 2012); Hoffman v. Houghton Chem. Corp., 434 Mass. 624, 637 (2001) (holding that “foreseeable” in context of “implied warranty failure to warn cases” did not include “ ‘hindsight’ analysis”; Commonwealth v. Forde, 367 Mass. 798, 802-03 (1975).

 he other two rationales were “traditional common law tort principles under which a manufacturer is liable for injuries caused by its own product!,]” and the notion that “brand-name manufacturers only ‘intend[] to communicate with their customers, not the customers of their competitors.’ ” Id. (quotation marks and citations omitted).

 “The 23 states that have been found to have rejected innovator liability are: Arkansas, Colorado, Connecticut, Florida, Georgia, Illinois, Indiana, Iowa, Kentucky, Louisiana, Maryland, Massachusetts [pursuant to Kelly, 2005 WL 4056740], Michigan, Minnesota, Mississippi, Nebraska, Nevada, New York, North Carolina, Ohio, Oklahoma, Pennsylvania, South Carolina, Tennessee, Texas, Utah, Washington, West Virginia.” 9 Bus. &Com. Litig. Fed. Cts. §98:10n.2 (3ded. Nov. 2015). Only “a handful of courts” have permitted a plaintiff to sue a brand-name drug manufacturer for injuries caused by ingesting a generic drug, and “[i]t remains to be seen whether these new decisions will evolve into a trend.” Id. §98:10.

 In Wyeth the plaintiff had ingested a brand-name drug, 555 U.S. at 558, and the Supreme Court held, in part, that the brand-name manufacturer “had a duty to provide a warning that adequately described [the] risk [once the risk had become known], and the CBE regulation permitted it to provide such a warning before receiving the FDA’s approval.” Id. at 571.

 See Quinlan v. Clasby, 71 Mass.App.Ct. 97, 103 (2008) (discerning no G.L.c. 93A violation where broker owed plaintiffs no duty.